**David Martin LONG, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 69781.**

Court of Criminal Appeals of Texas, En Banc.

Dec. 4, 1991.

Rehearing Denied Feb. 5, 1992.

E. Brice Cunningham, Dallas, for appellant.

John Vance, Dist. Atty., A. Wetherholt, A. Beach, J. Whittier & W. Scott, Asst. Dist. Attys., Dallas, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

MILLER, Judge.

Appellant was convicted by a jury of capital murder. V.T.C.A. Penal Code § 19.-03(a)(6). The trial judge assessed appellant's punishment at death by lethal injection after the jury returned affirmative answers to the three special issues submitted pursuant to Art. 37.071(b). Appellant raises thirty-five points of error in this direct appeal. Finding no reversible error in those points, we affirm the judgment of the trial court.

Appellant does not challenge the sufficiency of the evidence to support the jury's guilty verdict or its affirmative findings on the special issues. Thus, we proceed to only a brief recitation of the facts with further development of them as is necessary for addressing the points of error.

Dalpha Jester, her daughter Donna Jester, and Laura Lee Owens all died as a result of numerous chopping wounds to their heads and faces which appellant inflicted with a hatchet. Their bodies were discovered by Donna's boss on September 27, 1986, at the women's home in Lancaster. Laura's body was found in the front yard, while Donna and Dalpha were found laying on the bed in the back bedroom of the house. The murder weapon was found rinsed off and wrapped in a towel in a bathroom sink in the victims' home. Through entries in a diary kept by Donna, police were able to focus on appellant as their prime suspect. According to the diary and appellant's subsequent confession, Donna met appellant when she picked him up as he was hitchhiking on September 19, 1986. Since appellant "had no place to go" Donna allowed him to stay in her home in exchange for house repairs. Donna also agreed to supply appellant with cigarettes and wine, specifically MD 20/20 [1], while he worked on her home.

According to testimony from appellant and police, the women's home was filthy and smelled of dog hair and feces from several dogs who roamed freely through the home. Although he initially slept outside in Donna's car, appellant lived with Donna, Dalpha, and Laura for approximately one week during which time he developed an apparently loving and sexual relationship with Laura. During that week appellant began to fear that Donna had dead bodies, possibly of other hitchhikers, buried in her backyard. Appellant testified that on the day of the murders, September 27, 1986, he experienced these fears and a lot of unexplained emotions. Also, the filth and the smell in the house adversely affected him.[2] He did several repairs on the house that day and did not consume any

---

1. Also referred to as "Mad Dog" throughout the record.

2. Later testimony from a forensic psychologist who examined appellant revealed that appellant recalled foul odors at the time of his mother's death which occurred when appellant was 10 years old. This psychologist also testified appellant indicated to him that he was sensitive to strong odors and "would feel like he would be either out of control or he would become irritated or agitated (sic) when he would sense certain odors."

alcohol until Donna and Laura arrived home from their jobs. When Donna and Laura went to the back bedroom to talk with Dalpha, appellant thought they were conspiring against him. Appellant then retrieved and hid the hatchet. When Laura returned to the living area to watch television, he told her to go outside because he needed to talk to her, but instead he attacked her with the hatchet. Appellant then went into the back bedroom of the house and killed Donna and Dalpha. Appellant returned to the front yard and repeatedly struck Laura.[3]

After cleaning off the ax, appellant fled in Donna's car drinking MD 20/20 all the while. He was arrested that night in Buffalo for driving while intoxicated, but was later released. Appellant was eventually arrested on a felony warrant (from Dallas County) on October 24, 1986, in Austin where he had also been arrested for public intoxication.[4] Lancaster authorities took appellant back to Dallas County.

In his first three points of error, appellant complains of the trial court's refusal to excuse three prospective jurors upon his challenges for cause. The State contends appellant failed to preserve these points for review, or, alternatively, that each point is without merit. After reviewing the record from *voir dire*, we agree with the State's former contention.

In *Harris v. State*, 790 S.W.2d 568, 581 (Tex.Crim.App.1989), Judge Duncan, writing for the majority, clearly explicated the necessary steps to preserve error due to the trial court's denial of a defense challenge for cause to a prospective juror. Also *see Jacobs v. State*, 787 S.W.2d 397, 405 (Tex.Crim.App.1990). In order to warrant a reversal by this Court for the trial court's erroneous denial of that challenge for cause, it must be shown that:

1. the voir dire of the individual venireperson was recorded and transcribed;

2. the defendant asserted a clear and specific challenge for cause clearly articulating the grounds therefor;

3. after the challenge for cause is denied by the trial court, the defendant uses a peremptory challenge on that venireman;

4. all peremptory challenges are exhausted;

5. when all peremptory challenges have been exhausted, the defendant makes a request for additional peremptory challenges; and

6. finally, the defendant must assert that an objectionable juror sat on the case; i.e., the defendant must point out to the trial court that he is being forced to try the case with a juror seated whom he would have exercised a peremptory challenge had he had one.

In these first three points of error, appellant contends the trial court failed in granting his challenge for cause to prospective jurors Barnett, Gener, and Richardson because of their views on punishment ranges for lesser included offenses. Appellant exercised a peremptory challenge on each prospective juror after his challenge for cause was denied, but he failed to exhaust all peremptory challenges or request any additional ones.[5] During the prosecutor's *voir dire* of juror Burchett, who was selected as the twelfth juror, he asked Burchett whether there was anything he should know about her background "before I choose you on this jury." Defense counsel objected to this remark, and the objection was sustained. Defense

---

3. Appellant initially attacked Laura from behind. Dalpha was particularly defenseless against appellant as she was a 65 year old woman who was partially blind and needed a walker for mobility. All three victims sustained defensive wounds to their hands and arms.

4. Appellant told Austin police that his name was "Aaron Kyle Sanders." Through fingerprint comparisons police determined his true identity and arrested him again on the felony warrant.

5. As to prospective juror Richardson, appellant also failed to clearly articulate a ground for his challenge for cause. The record reflects that when appellant "excused" Richardson the trial judge noted he had used his tenth peremptory challenge. Appellant then inquired whether his challenge for cause was overruled, which challenge the trial never heard (nor do we find one in the record). Nevertheless, the trial judge denied the challenge for cause for which no basis was given.

counsel's challenge for cause on this basis was denied, and the trial judge instructed Burchett to disregard the comment. At the conclusion of Burchett's *voir dire*, the State accepted her as a juror, but defense counsel reurged his challenge for cause which was again denied. Defense counsel then accepted Burchett "under protest" as a juror since they only had one remaining peremptory challenge and the next venireman was a Dallas police officer. The State responded that this venireman, Wallace, had already made comments [6] which would subject him to a challenge for cause.[7] Voir dire concluded shortly thereafter without defense counsel ever using their fifteenth peremptory challenge.

Although appellant accepted Burchett "under protest," arguably making her an "objectionable juror," appellant did not use his final peremptory challenge to excuse this juror. Under this record, appellant has failed to preserve any error. Appellant's first three points of error are overruled.

In the fourth point of error, appellant avers the trial judge erred in excusing seven venirepersons upon the State's challenges for cause on the basis of *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). Before addressing the merits of each challenge for cause, we note appellant has not preserved error for review in regard to three of these venirepersons. In *Crane v. State*, 786 S.W.2d 338, 345 (Tex.Crim.App.1990), this Court held that if an appellant does not object when a venireperson is excused for cause, he may not challenge that ruling on appeal. After reviewing the record, we find appellant failed to object to the excu-

sal of venirepersons Wade, Ledbetter, and Striplin, and, therefore, nothing is preserved for our review. We will address the merits of this point of error concerning the remaining four venirepersons. Appellant presents one argument applicable to all four.

■■ Appellant asserts that the beliefs regarding the death penalty of the prospective jurors who were excused were not so strong that they would disregard the evidence with respect to appellant's guilt and the special issues or that those beliefs would substantially impair or prevent their performance as jurors. The proper inquiry for the trial court in disqualifying jurors in death penalty cases under *Witherspoon, Wainwright v. Witt*, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), and *Adams v. Texas*, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980), is whether a prospective juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with the trial judge's instructions and the juror's oath. *McGee v. State*, 774 S.W.2d 229, 235 (Tex.Crim.App.1989). The trial judge's decision to excuse a prospective juror under this principle will be reversed only upon a clear abuse of discretion, and, in reviewing this decision, this Court considers the prospective juror's voir dire as a whole and accords due deference to the trial judge's ruling. *Crane*, 786 S.W.2d at 344. A review of the prospective jurors' voir dire follows.

Venireman Rodriguez indicated on his juror questionnaire form that he did not believe in the death penalty. Upon question-

---

**6.** This venireman evidently indicated that he would probably believe the testimony of a police officer over any other witness at trial.

**7.** The parties agreed to select an alternate juror. Wallace was the first venireman, but the State and defense counsel agreed to excuse him. The trial judge pointed out that the State and defense each had one peremptory challenge to use while selecting the alternate juror. See Art. 35.15(d), V.A.C.C.P., and *Harris*, 790 S.W.2d at 581–82 (trial judge properly prohibited defendant from exercising one of his original fifteen peremptory challenges during selection of alternate juror). The next two veniremen were ex-

cused for cause, and the final venireman was peremptorily challenged by defense counsel who stated he was using his fifteenth peremptory challenge. When questioned by the prosecutor as to the propriety of such action, the trial judge responded "[q]uite frankly, I don't give a damn right now." Apparently exasperated with the jury selection process, the trial judge decided not to select an alternate juror.

Clearly, under Art. 35.15(d) and *Harris*, appellant was precluded from using his fifteenth original peremptory challenge on an alternate prospective juror.

ing from the court and defense counsel, Rodriguez stated that he could follow the law at the guilt/innocence stage but under no circumstance could he vote to impose capital punishment because of his religious beliefs. Rodriguez stated further that even if there was sufficient evidence to support "yes" answers to the special issues at punishment, he would have to vote "no" because he could not be part of a jury which "would send a man to death."

As to the next venireperson, when asked on the questionnaire whether she believed in the death penalty, venireperson Himbert answered "I cannot answer a simple yes or no; if I have to say yes or no, I would say no. I would prefer to hear all the evidence in an individual case first to make such a serious decision." She also stated, however, that she had personal beliefs which prevented her from sitting in judgment of another person and rendering a verdict which resulted ultimately in the execution of another human being. Himbert explained to the court that she recognized "intellectually" that there were appropriate cases for the death penalty but "emotionally" she could not live with her decision to sentence someone to death. Knowing that affirmative answers to the punishment issues led to imposition of the death penalty, Himbert stated she would have to answer "no" to those issues and that she could not follow the law.

Upon questioning from the prosecutor, Himbert answered unequivocally that her views regarding the death penalty would impair her performance as a juror in accordance with the oath. However, Himbert told defense counsel that if she were under oath and had sworn to uphold the law she would answer "yes" to the special issues when the evidence supported that answer beyond a reasonable doubt. The trial court eventually resumed questioning in an effort to clarify the prospective juror's an-

swers. Himbert stated that if she were a juror she would not be able to follow the law or her oath and answer "yes" to the punishment issues.

Appellant next complains of the excusal of prospective juror DeLeon. On her juror questionnaire form, DeLeon indicated that because of religious beliefs she did not believe in the death penalty. DeLeon believed that God is the only one who can decide who must die. She explained to the trial court that these views would lead her to automatically vote against imposition of the death penalty but that she could find a person guilty of capital murder. DeLeon then gave conflicting answers when questioned by counsel, but further questioning by counsel and the trial judge revealed DeLeon was somewhat confused about the bifurcated trial system. The trial judge commented that DeLeon appeared afraid to express her opinion, and upon reassurances that nothing she said was contemptuous, she stated that she would not vote "yes" to the punishment issues even if the State had proven beyond a reasonable doubt that the answers should be "yes."

Appellant also objected to the excusal of venireperson Curry.[8] She was first questioned by the prosecutor who determined Curry was against the death penalty, would abstain from voting on the punishment issues to prevent its imposition, and could not take the juror's oath as to the punishment stage. Defense counsel established Curry could find the defendant guilty of capital murder, but Curry was unwavering in her position that she would abstain from answering the punishment issues.

In light of these statements, the trial court clearly did not abuse its discretion in granting the State's challenges for cause. *DeBlanc v. State*, 799 S.W.2d 701, 717 (Tex.Crim.App.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 2912, 115 L.Ed.2d 1075.

8. In this point of error, appellant lists Curry as one of the venirepersons incorrectly excused for cause but does not address her specific responses in his brief. We find, however, that in his seventeenth point of error appellant complains of the trial court's excusal of Curry upon the State's challenge for cause based on *Wither-*

*spoon.* For the sake of simplicity and continuity, we have addressed the merits of the excusal of venireperson Curry in this fourth point of error as if it had been discussed therein, and summarily overrule appellant's seventeenth point of error.

Each of these prospective jurors was unwavering and unequivocal in his opposition to the death penalty. Although there is no requirement that a prospective juror's bias be proved with unmistakable clarity, that situation is presented here. Appellant's fourth point of error is overruled.

In his fifth point of error, appellant complains the trial judge erred in allowing the prosecutor to engage in improper jury argument during the guilt/innocence stage of trial, and in his sixth point of error, appellant contends the trial court erred in refusing to grant his motion for mistrial after sustaining his objections to the State's arguments. Appellant presents these points together with the same argument and authorities.

■ The law provides for, and presumes, a fair trial, free from improper argument by the prosecuting attorney. *Borjan v. State*, 787 S.W.2d 53, 56 (Tex.Crim. App.1990). It is axiomatic that proper jury argument falls within one of four distinct categories: (1) summary of the evidence; (2) reasonable deduction from the evidence; (3) in response to argument of opposing counsel; and (4) plea for law enforcement. *Id.* at 55. Reversible error results from improper prosecutorial argument only when the argument is "extreme, manifestly improper, injects new and harmful facts into [the] case or violates a mandatory statutory provision and is thus so inflammatory that its prejudicial effect cannot reasonably be cured by judicial instruction to disregard argument." *Hernandez v. State*, 819 S.W.2d 806, 820 (Tex.Crim.App.1991).

We do not independently address the merits of each statement made by the prosecutor which appellant contends was erroneous because to do so would only unnecessarily elongate this opinion and add little, if anything, to an already well-settled area of the law. In four of the seven complained of arguments at the guilt/innocence stage, the trial judge sustained defense counsel's timely objection and instructed the jury to disregard the prosecutor's remarks.[9] We have reviewed these arguments in light of the entire record and find that none is so prejudicial that it was not cured by the trial judge's prompt admonishments.[10] However, in two instances the trial judge overruled appellant's objection to the State's arguments, and we must determine if this action was erroneous.

■ While summarizing the State's evidence, the prosecutor stated as an aside that "I think that you know now that the State didn't call everybody that could have been called as a witness." Appellant objected the argument was outside the record, and the prosecutor responded "Judge, I think the record reflects that the defense called certain witnesses that the State didn't." The trial judge *sua sponte* instructed the jury to "recall the evidence as you heard it ... what the lawyers say is not evidence." Upon inquiry from defense counsel, the trial judge stated he overruled the objection. Even though the trial judge overruled the objection, his instruction to the jury was sufficient to cure any error from the prosecutor's comment, and we find no reversible error on this record.

■ In another argument which appellant complains was outside the record, the prosecutor stated "that science has often been described as looking for a black cat in a dark room." The prosecutor was referring to the testimony of the psychologist called by the defense regarding appellant's

---

9. In another argument, where the prosecutor, using an Adolf Hitler analogy, implied appellant was evil, the trial judge sustained defense counsel's objection to the argument but denied his motion for mistrial. Defense counsel failed to ask for a jury instruction to disregard the argument after the trial judge sustained the objection. While we believe an instruction to disregard would have cured any error from this argument, we hesitate to conclude in light of this record that the prosecutor's comment was improper where *defense counsel* had contended in argument that appellant was a "sick person,"

had "mental problems," and compared him to a trapped "mad dog." See *Bolding v. State*, 493 S.W.2d 181, 184 (Tex.Crim.App.1973).

10. In fact one of the arguments to which an objection was sustained and an instruction given was a proper plea for law enforcement. The prosecutor argued "when you come back with that verdict, you will be telling the law abiding citizens of this county...." See *Borjan*, 787 S.W.2d at 56, and cases cited therein.

mental disorders and the inferences to be drawn therefrom when that evidence is considered in light of the testimony from the State's psychiatrist. During the psychologist's testimony on cross-examination by the State, he conceded that psychological diagnoses were not certain, infallible, and absolutely reliable. We find that in the prosecutor's jury argument he used a metaphor in his summary of the evidence at trial which, under the facts of this case, was a proper area of jury argument. Thus, we conclude the trial judge did not err in overruling appellant's objection. The fifth and sixth points of error are overruled.

In his seventh and eighth points of error, appellant contends the trial court erred in allowing the State to engage in improper jury argument during the punishment phase and in refusing to grant a mistrial after sustaining appellant's objections to the arguments. Appellant presents the same argument and authorities for these two points as he did for his fifth and sixth points of error. In order to set the stage for these contentions, we must review evidence from the record.

Evidence of the two following extraneous offenses was admitted during the punishment phase of trial. Shortly after appellant was arrested and transported to Lancaster on October 24, 1986, appellant confessed to the commission of two other murders. The first occurred in 1978 in San Bernardino, California. While driving while intoxicated, appellant jumped a median, causing two flat tires on his car. According to his confession, appellant had the flat tires repaired at a gas station but felt that he had been overcharged by the attendant, which angered him.[11] Appellant therefore beat the gas station attendant to death with a tire iron and "then took a broom and stuffed the handle of it down his throat to be sure he was dead." In another confession, appellant admitted killing his supervisor at a cable television com-

pany in Bay City in December 1983, because he held a grudge against the man. Appellant had been using heroin and preludin on a regular basis at that time. Appellant went by his supervisor's home and found him passed out from intoxication and also found several hundred dollars in the victim's billfold. Appellant states he "snapped," set the victim's trailer on fire, and took all but twenty dollars of the money so it would not look like a robbery. Both confessions were read before the jury.[12]

In defense counsel's jury argument, the following occurred:

[Defense counsel]: I don't know what David Martin Long's mental state was in 1978 in San Bernadino, California. I don't know what his mental state was in 1983 in Bay City, Texas. I wasn't there and we weren't there, and we have not had the benefit of what you have had for the last 8 days.

You haven't heard all of the details about San Bernadino—

MR. WHITTIER [prosecutor]: Excuse me, Judge. We're going to object to counsel's remark about evidence not brought in this trial. They had a fair opportunity at the time of the punishment hearing to present anything they wanted to. I think it is illegal and unfair to the State for counsel to be allowed to argue about the facts outside the record, Your Honor.

THE COURT (sic): I haven't argued one fact outside the record.

THE COURT: I'll overrule the objection.

MR. CUNNINGHAM [defense counsel]: I think you realize that before the lawyers talked with you on Saturday, you had heard 5, or 4 days of testimony. That wasn't true of San Bernadino or Bay City.

As I said, I don't know what [appellant's] mental state was at that time. I

---

11. Appellant's confession notes he was already feeling anger at that time because he had been asked to leave a wedding reception for smoking marihuana.

12. Other witnesses' testimony during punishment corroborated the facts in these confessions.

do know, and you know that he had been in and out of mental institutions ...

 Appellant first complains of the following statements by the prosecutor in his rebuttal argument:

Defense counsel suggests to you that there are facts that you didn't hear that are real critical. Who knows what those facts are? Who could provide these lawyers with the means of compelling that evidence and having it brought before you? David Martin Long.

At this juncture, defense counsel objected that the argument was a comment on appellant's failure to testify in the punishment phase of trial.[13] The trial judge sustained the objection, admonished the jury to "disregard the reference by State's attorney", and denied appellant's motion for mistrial. The prosecutor continued:

Ladies and gentlemen of the Jury, if there was something out there about those offenses that was important, outside of those statements that were offered into evidence, you would have heard them. You would have heard them. Issue No. 1.

The trial judge then interrupted the prosecutor without objection from defense counsel and instructed the jury the following:

Members of the Jury, just in an over abundance of caution, the defendant has no obligation in the punishment portion of the trial to bring you any evidence one way or the other, regardless of the case the State brought you with regard to the other killings. He had no obligations, he is under no obligations.

And in your mind if you perceive an obligation, you are to move it out of your mind at this time. This is a burden that only the State has. The defendant has a right not to do anything in this portion of the trial.

Anyone have any problem with doing that?

Okay. You may proceed, Mr. Whittier [prosecutor], and please stay away from that area.

The "facts which were not heard" to which the prosecutor was referring in his rebuttal argument concerned the extraneous offenses described in appellant's confessions *infra*.

In its brief, the State does not argue that the prosecutor's remark was *not* a comment on appellant's failure to testify, but rather, the State asserts the argument was proper because it was invited by defense counsel's argument. *Nethery v. State,* 692 S.W.2d 686, 703 (Tex.Crim.App.1985), *cert. denied,* 474 U.S. 1110, 106 S.Ct. 897, 88 L.Ed.2d 931 (no reversible error where prosecutor's argument responds to defense argument regarding motive).[14] Nevertheless, the State also contends there was no reversible error because the trial judge's instructions to the jury cured any error and, further, that any error was harmless beyond a reasonable doubt.

We agree that the State's argument was invited, but even if it could be construed as an uninvited comment, we agree that any error was cured. In *Bower v. State,* 769 S.W.2d 887, 907 (Tex.Crim.App.1989), also a capital murder case, this Court held the trial judge's instruction to the jury cured any harm flowing from the prosecutor's comment on the defendant's lack of remorse and shame. In *Bower,* as in the case *sub judice,* defense counsel's objection was sustained, the jury was instructed to disregard the comment, and the motion for mistrial was denied. 769 S.W.2d at 906. The Court noted that "[o]rdinarily, any injury from improper jury argument is obviated when the court instructs the jury to disregard, unless the remark is so inflammatory that its prejudicial effect cannot reasonably be removed by such an admon-

---

**13.** Appellant testified twice during guilt/innocence in spite of his counsel's advice against such action, and he presented jury argument during the punishment phase.

**14.** Indeed, it would be rather disingenuous for the State to assert the argument was not a comment on appellant's failure to testify at pun-

ishment when the State actually used the appellant's name. Cf. *Madden v. State,* 799 S.W.2d 683, 700 (Tex.Crim.App.1990) (prosecutor's argument that "there is only one person who knows" constituted direct comment on failure to testify).

ishment." *Id.* at 907, citing *McKay v. State,* 707 S.W.2d 23 (Tex.Crim.App.1985), and *Logan v. State,* 698 S.W.2d 680 (Tex. Crim.App.1985). Reviewing the record from the punishment hearing, we conclude the prosecutor's comment was not so prejudicial that it could not be cured by the particularly thorough instructions from the trial judge to the jury on the defendant's right not to testify.

■ Appellant also complains of the prosecutor's argument which characterized him as less human than any person with which the jury will ever have contact. The trial court sustained appellant's objection and instructed the jury to disregard the comment. In light of the facts of this case, this comment was not so prejudicial as to require a reversal of the conviction, if it was error at all. See *Easley v. State,* 454 S.W.2d 758 (Tex.Crim.App.1970) (calling the defendant a "savage"); *McKay,* 707 S.W.2d at 37 (reference to defendant as a "wolf" reasonable deduction from evidence of cold-blooded killing). Appellant's seventh and eighth points of error are overruled.

■ In points of error numbers nine through thirteen, appellant complains of the admission into evidence of numerous photographs. Appellant asserts the highly inflammatory and prejudicial nature of the photographs outweighs any probative value that the photographs might have and that the photographs were offered "solely to inflame the minds of the jury." Appellant presents this one argument for all five points of error.[15] The State counters implicitly that the photographs were highly probative of the fact and manner of the victims' deaths and the appellant's culpable mental state.

■ Appellant and the State both rely on the now axiomatic rule for admissibility of photographs as stated in *Martin v.*

State, 475 S.W.2d 265, 266–67 (Tex.Crim. App.1972), *cert. denied,* 409 U.S. 1021, 93 S.Ct. 469, 34 L.Ed.2d 312 (1972), in addressing the merits of these points of error. This Court held in *Martin* that:

[I]f a photograph is competent, material and relevant to the issue on trial, it is not rendered inadmissible merely because it is gruesome or might tend to arouse the passions of the jury, unless it is offered solely to inflame the minds of the jury. If a verbal description of the body and the scene would be admissible, a photograph depicting the same is admissible.

475 S.W.2d at 267 (footnotes omitted). This Court has further held:

The admission in evidence of photographs is within the discretion of the trial court, who determines whether they serve a proper purpose in the enlightenment of the jury. *Brasfield v. State,* 600 S.W.2d 288 (Tex.Cr.App.1980); *Terry v. State,* 491 S.W.2d 161 (Tex.Cr.App.1973)

. . .

In determining whether the trial court erred in admitting photographs in evidence, the controlling factor is whether the probative value of the photographs was greatly outweighed by their prejudicial effect. The prejudicial effect of the photographs may be determined by the number of exhibits offered, their gruesomeness, their detail, their size, whether they are black and white or color, whether they are close-up, whether the body is naked or clothed, and by factors unique to each situation photographed. See generally *Martin v. State,* 475 S.W.2d 265 (Tex.Cr.App.1972); see also *Reimer v. State,* 657 S.W.2d 894 (Tex.App.—Corpus Christi 1983, no pet.).

*Burdine v. State,* 719 S.W.2d 309, 316 (Tex.Crim.App.1986), *cert. denied,* 480 U.S. 940, 107 S.Ct. 1590, 94 L.Ed.2d 779 (1987).

Neither appellant nor the State addresses the admissibility of these photographs in

---

**15.** In his tenth point of error, appellant complains of the admission of State's exhibits Nos. 28–34. At trial, however, appellant objected to the admission of these photographs only on the basis that the authenticating witness could not testify the photographs fairly and accurately depicted that which they purport to show. Since

his trial objection does not comport with the issue raised on appeal, nothing is preserved for our review. *Johnson v. State,* 803 S.W.2d 272, 293 (Tex.Crim.App.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 2914, 115 L.Ed.2d 1078 (1991). Appellant's tenth point of error is therefore overruled.

light of the Texas Rules of Criminal Evidence which became effective September 1, 1986, and govern trials conducted thereon or thereafter.[16] Article IV of the Rules of Evidence addresses relevant evidence and its admissibility, two issues extensively discussed in *Montgomery v. State*, 810 S.W.2d 372 (Tex.Crim.App.1991) (Opinion on Rehearing). *Montgomery* dealt specifically with the admissibility of extraneous offenses under Rule 404(b), but its pronouncements regarding Rules 401, 402, and 403 are applicable when addressing the admissibility of evidence in general.[17]

▮▮▮▮ Rule 403 applies only to relevant evidence. The approach under Rule 403 is to admit relevant evidence *unless* its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence. Tex.R.Crim.Evid. 403. *Montgomery*, 810 S.W.2d at 389, citing *Crank v. State*, 761 S.W.2d 328, 342, n. 5 (Tex.Crim. App.1988). The rule favors admissibility of relevant evidence, and the presumption is that relevant evidence will be more probative than prejudicial. *Montgomery*, 810 S.W.2d at 389. When admitting evidence, the trial judge does not *sua sponte* engage in balancing the probative value against the prejudice, but does so only upon sufficient objection invoking Rule 403 by the party opposing admission of the evidence. *Id.* at 388. "But once the rule is invoked, 'the trial judge has no discretion as to whether or not to engage in the balancing process.'" *Id.* at 389, citing 22 Wright & Graham, Federal Practice and Procedure: Evidence § 5250 (1978), at 544–45.

We now discuss the rules of evidence as they apply to the admissibility of photographs in a trial. As we noted, prior to the promulgation of the rules of evidence this Court utilized the *Martin* test in addressing the admissibility of photographs and, in fact, we have recently adhered to this pre-rules of evidence test in *Goodwin v. State*, 799 S.W.2d 719 (Tex.Crim.App.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 2913, 115 L.Ed.2d 1076, a trial which post-dated the effective date of the rules of evidence. Relying on *Burdine*, 719 S.W.2d at 316, (cited *supra* at p. 270), for the law on admission of photographs, and without expressly considering the new rules of evidence, this Court determined in *Goodwin* that the trial court did not err in admitting into evidence autopsy photographs of the victim because the Court "[could not] conclude that the probative value of the photographs was greatly outweighed by their prejudicial effect." *Id.* at 739. In reaching this conclusion, this Court engaged in the following analysis:

In the instant case, the medical examiner used the autopsy photographs to illustrate and explain his testimony to the jury. The examiner's testimony as to identification of the victim and the cause of death was admissible. The photographs accurately depicted that testimony. Since verbal descriptions of the body, the identification of the body and the cause of death were admissible, the photographs were admissible unless their probative value was substantially outweighed by their prejudicial effect. Tex. R.Crim.Evid. 402.

*Id.*[18] After determining the relevancy of the photographs, the Court engaged in what may be termed a Rule 403 analysis:

dispense with any discussion of whether the photographs were "relevant" to an issue in this cause and assume, as do the parties, that the photographs were relevant. *See generally* Rules 401, 402 and discussion in *Montgomery*, 810 S.W.2d at 386–87.

**16.** The trial on the merits in this cause began on February 2, 1987.

**17.** In a pre-trial motion objecting to the admissibility of photographs, appellant asserted the photographs were irrelevant to an issue at trial, would be offered solely to inflame the minds of the jurors, had very slight probative value, if any, and had great inflammatory aspects. At trial appellant objected to admission of the photographs based on this pre-trial motion and the gruesomeness of the photographs, but on appeal he abandons the relevancy objection; thus, we

**18.** In this paragraph the Court actually addresses the *relevancy* of the photographs. The identity of the victim and the manner and means of death are certainly "fact[s] that [are] of consequence to the determination of the action" which in *Goodwin*, as in the present cause, was

Only a limited number of photographs were offered and those offered related directly to the medical examiner's testimony on identification and cause of death. The photographs were in color, but were of normal size and the body was clothed. The medical examiner attempted to explain what damage had been caused by the gunshot wounds and identified the damage caused by animals and decomposition. Some of the photographs were close-ups and showed the details of damage to the body. The photographs were no more gruesome than can be expected under the circumstances. There is nothing in the record or the photographs to support appellant's contention that portions of the body had been cut away during autopsy. Considering all factors, we cannot conclude that the probative value of the photographs was *greatly* outweighed by their prejudicial effect.

*Id.* (emphasis added).

Although the *Goodwin* opinion used "greatly outweighed" as the measuring standard, we believe the prejudice analysis is sound in light of Rule 403 and *Montgomery*, 810 S.W.2d at 389. As we noted on page 271, *supra*, the Court in *Goodwin* relied on prior caselaw, most specifically *Burdine*, in determining the prejudicial effect of the autopsy photos. The factors cited in those cases—number of exhibits offered, their gruesomeness, their detail,

their size, whether they are black and white or color, whether they are close-up, whether the body is naked or clothed—are factors appropriate for consideration in a Rule 403 analysis. We adhere to the use of those factors today, and add that the availability of other means of proof and the circumstances unique to each individual case must also be considered. However, in light of the instruction in Rule 403 that relevant evidence is admissible unless its probative value is "substantially outweighed"[19] by its prejudicial effect, we must abandon that part of *Martin* which held that a photograph "is not rendered inadmissible merely because it is gruesome or might tend to arouse the passions of the jury, *unless it is offered solely to inflame the minds of the jury."* *Martin*, 475 S.W.2d at 267. Rule 403 requires that the photograph have *some* probative value and that its probative value not be substantially outweighed by its inflammatory nature. Therefore, all prior cases, such as *Martin*, allowing admissibility of photographs unless the photographs were offered into evidence *solely* for inflammatory purposes no longer have precedential value under the present rules of evidence.

■ With these principles in mind, we may now address the merits of appellant's points of error. As noted, appellant objected to the admissibility of the photographs on the basis of their prejudicial nature.[20] Initially we point out that each of the ob-

a capital murder. Tex.R.Crim.Evid. 401. The medical examiner's testimony regarding these two facts tends to make the existence of these facts more probable than they would be without the evidence. This testimony meets the definition of "relevant" as stated in the rules of evidence, specifically Rule 401. Since the testimony must be relevant to the cause to be admissible, then pictures or photographs depicting or facilitating this testimony are arguably relevant as well, as they have a "tendency to make the existence of any fact that is of consequence to the determination of the action more probable ... than it would be without the evidence." Tex.R.Crim.Evid. 401. Thus, that part of the *Martin* test which deems admissible a photograph if a verbal description of the same is admissible remains viable. However, the mere fact that there was testimony to which the photographs relate does not guarantee the photographs will be admitted as relevant evidence.

Rule 402 limits admissibility of relevant evidence, as does Rule 403, discussed *infra*.

19. "When Rule 403 provides that evidence 'may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice,' it simply means that trial courts should favor admission in close cases, in keeping with the presumption of admissibility of relevant evidence." *Montgomery*, 810 S.W.2d at 389.

20. The "unfair prejudice," which is the focus of appellant's points of error numbers 9–13, "does not ... mean that the evidence injures the opponent's case ... [but] refers to 'an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'" Goode, Wellborn and Sharlot, *Texas Rules of Evidence: Civil and Criminal*, 33 Texas Practice § 403.2, p. 93, citing Advisory Committee's Note to Federal Rule 403.

jected-to exhibits is an 8 × 10 color photograph of the victims who are fully clothed. In the ninth point of error, appellant complains of the admission of thirteen photographs (State's exhibits nos. 6–12, 17–22) depicting the victims' bodies at the crime scene. In a hearing outside the jury's presence, the trial court reviewed the exhibits and questioned the prosecutor as to the necessity of certain pictures, who proffered that each picture reflected a "unique perspective" of the crime scene as discovered by the police. State's exhibits 6–12 depict Laura's body lying in the front yard of the house, with each photograph taken at a closer angle to the body. Exhibits 17–22 are photographs taken leading into and within the back bedroom where Dalpha and Donna were murdered. The prosecutor admitted to the trial court that some of the exhibits were "gory" but that was the nature of this offense. The prosecutor also stated that he had "eliminated probably three quarters of the photographs taken in order not to duplicate any evidence depicted in the photographs." We agree with the prosecutor's assessment that some of these exhibits are gory, but this offense was horribly gruesome and that fact alone will not render the probative value of the exhibits substantially outweighed by any prejudicial effect. The photographs are limited in number and reflect the fact and the manner of the victims' deaths and the appellant's mental state. Moreover, from reviewing the original exhibits [21], we have found that some of the photographs must be viewed together to accurately determine the nature of the wounds inflicted upon the victims. We conclude the probative value of exhibits 6–12 and 17–22 was not substantially outweighed by any prejudice, and, therefore, the trial court did not err in

admitting these exhibits at trial. The ninth point of error is overruled.

■ In points of error eleven, twelve, and thirteen, appellant complains of the admission at the punishment phase of photographs depicting extraneous offenses.[22] See discussion *supra* at pp. 268–269. State's exhibits 90–93 are 8 × 10, black and white photographs from the crime scene of the San Bernardino murder. The exhibits partially depict the victim as he was found in the service station's tool room; only one of the four exhibits is a close-up view of the victim's bloodied face. State's exhibits 97, 101, and 102 are 3½ × 5, color photographs from the same offense which depict the slightly bloody broom stick and the blood smears on the tool room door.[23] Finally, State's exhibit 112 contains two 3½ × 5 photographs of the victim from the Bay City offense. The victim is shown in his underwear and is covered in ashes.

Although several of these exhibits depict a murder victim, none of the exhibits is gruesome. The color photographs are small and depict very little blood. Each exhibit corroborates appellant's confessions wherein he details the manner in which each man was killed. These exhibits, which were only admitted at punishment, are highly probative of appellant's propensity for violence and viciousness, facts which directly impact the jury's answers to the punishment issues. The trial judge did not err in admitting these exhibits; points of error eleven through thirteen are overruled.

■ In his fourteenth point of error, appellant complains of the trial court's admission of State's exhibits 39–46, 48–56, and 59–62, autopsy photographs of the

---

**21.** Only photostatic copies of these exhibits, in which the depictions were sometimes indistinguishable, were included in the record when submitted to this Court. However, pursuant to Tex.R.App.Proc. 51(d), the Clerk of this Court has obtained the original exhibits for our inspection.

**22.** In point of error eleven appellant complains of the admission of State's exhibits 90–93; in point of error twelve, State's exhibits 97, 101,

and 102; and in point of error thirteen, State's exhibit 112.

**23.** State's exhibit 97 depicts the blood smears on the door and only partially depicts the victim's body which is barely discernable. State's exhibit 90 shows the victim's body from his chest to approximately his knees laying in a pool of blood. This picture was taken through the doorway of the tool room.

three victims in this case.[24] At a hearing outside the jury's presence [25], the State offered the autopsy photographs for several reasons: to prove at punishment that appellant's behavior at the time of the offense was deliberate and calculated to result in death; that the medical examiner would testify as to the victims' time of death proving the murders occurred during the same criminal transaction as charged in the indictment; and because the pictures would supplement the medical examiner's testimony as to where the wounds were inflicted upon the victims and how he determined how many wounds had been inflicted. Appellant countered that these exhibits should not be admitted into evidence because they were "beyond gruesome" and were in fact "gross" and that their probative value was outweighed by the "highly prejudicial and inflammatory nature" of the photographs. In ruling the photographs were admissible, the trial judge stated:

Let the record reflect that the Court has gone through each of the photographs. And in looking at them, attempting to remove duplication as well as some of the more—for lack of a better word, I guess grotesque pictures, in that some of the pictures reflect pictures that are of persons bleeding and dirty where as others show where the body has been cleaned and marks or cuts are more visible and not as grotesque. The Court is attempting to allow those to be presented to the jury....

After the trial judge's ruling, the jury entered the courtroom and appellant then pled "guilty as hell" to the charges in the indictment (see footnote 25, *supra*).

The autopsy photographs admitted into evidence during the medical examiner's testimony, which followed appellant's plea of guilty, depict the victims both before and after their body fluids were removed by the medical examiner and before and after the dried blood was cleaned from their wounds. These $8 \times 10$, color photographs were taken at close range and very graphically show the wounds suffered by each woman. In many of the exhibits the victims' hair has been shaved to more accurately display the chopping wounds sustained on their heads and some of the wounds have been closed with sutures which enabled the medical examiner to accurately determine how many chopping wounds were inflicted upon each woman.[26] The medical examiner testified that each woman died as a result of multiple chopping wounds to the head.

We agree with the State that these photographs are relevant to and probative of each of its proffered reasons for admitting these exhibits. Indeed, the medical examiner was entitled to testify to the manner of death, the cause of death, the time of death, and the number of wounds sustained by each victim; issues to which these photographs were relevant. However, we cannot agree that all of the photographs were admissible. Three exhibits display two of the victims as they appeared when they arrived at the medical examiner's office. These photographs are no different than the crime scene exhibits earlier admitted into evidence except for the fact that the victims have been physically removed from the crime scene. The remaining exhibits are close-up photographs of gaping chopping wounds, sutured chopping wounds, and defensive wounds; the same wounds

**24.** The trial judge sustained appellant's objection to State's exhibit 60, and State's exhibit 50 was not included in the record; therefore, no error is presented as to the admission of either of these photographs. *See James v. State,* 772 S.W.2d 84, 98, n. 14 (Tex.Crim.App.1989), *cert. denied,* —— U.S. ——, 111 S.Ct. 2915, 115 L.Ed.2d 1078 (1991).

**25.** During the trial, defense counsel informed the trial judge that appellant wished to change his not guilty plea to a guilty plea. The trial judge then recessed the jury for lunch so he and

the attorneys could fully discuss with appellant the consequences of such a plea and determine appellant was intelligently making this plea. The parties then recessed for lunch, and after this recess, but before the jury returned from its lunch recess, the trial judge conducted the hearing on the admissibility of the autopsy photographs and ruled thereon.

**26.** Several of the wounds had crisscrossed each other or were repeatedly inflicted in the same area; thus, the sutures were used to better determine the actual number of wounds.

depicted in the crime scene photographs (State's exhibits 6–12, 17–22) but after having been cleaned. These photographs are entirely cumulative of less gruesome photographs available to the State which were in fact admitted, i.e., the crime scene exhibits. The photographs therefore have very little probative value and, considering their gruesomeness, were very prejudicial. After reviewing these photographs, we conclude their probative value is substantially outweighed by their prejudicial nature and cumulative effect. Thus, we hold the trial judge erred in admitting the same. Tex. R.Crim.Evid. 403.

The question now remains whether the erroneous admission of these State's exhibits was reversible error pursuant to Tex.R.App.Proc. 81(b)(2). The cause will not be reversed under Rule 81(b)(2) merely because the jury was exposed to numerous admittedly "gruesome" pictures. The manner of commission of this offense was horribly cruel and violent and that is one factor we consider in this particular 81(b)(2) analysis. *Harris*, 790 S.W.2d 568, 586 (appellate court reviews entire record in harmless error analysis). Appellant's confession and the properly admitted photographs of the crime scene reflect the macabre nature of this offense, an offense which was entirely unprovoked by its victims. In his confession, appellant notes Dalpha Jester pled for her life immediately before he struck her. Prior to admission of the autopsy photographs before the jury, appellant admitted he intentionally killed the three women and he would have shot them if he had had a gun. Consequently, appellant's guilt was uncontroverted during the trial although the State was still required to prove beyond a reasonable doubt the allegations within the indictment. Moreover, appellant also testified at guilt/innocence to his extensive history of drug abuse and psychological problems, that he was irreparable and should die, and that he wanted to avoid a trial. Other witnesses, including appellant's family members, testified to appellant's mental problems and numerous admissions into state hospitals and halfway houses. Any impact of the trial court's error in admit-

ting the autopsy photographs was dissipated by the bizarre facts and circumstances of this cause and this other evidence. The error was therefore harmless. Point of error fourteen is overruled.

In his fifteenth point of error, appellant contends the trial court erred and abused its discretion in refusing to allow him to question prospective juror McIntosh on the range of punishment. After reviewing the record, we find this point is without merit. At the conclusion of McIntosh's voir dire examination, the State and appellant agreed to excuse this prospective juror, therefore neither appellant nor the State had to expend a peremptory challenge to remove this venireperson from the panel. Thus, assuming *arguendo* the trial court erred in limiting appellant's questioning of McIntosh, no harm is shown. *Gardner v. State*, 730 S.W.2d 675, 689 (Tex. Crim.App.1987) (if defendant prevented from asking proper question, harm presumed because he could not intelligently exercise his peremptory challenges). The fifteenth point of error is overruled.

In the sixteenth point of error, appellant contends the trial court materially erred in restricting voir dire examination of the prospective jurors. After making preliminary remarks and conducting a general voir dire of the panel, the trial judge gave each member of the panel a juror questionnaire form to complete and scheduled individual voir dire for each venireperson. The trial judge anticipated individual voir dire would last thirty to forty-five minutes per venireperson and scheduled them accordingly. The record reflects no objection by appellant to this scheduling nor has appellant referred us to anyplace in the record where he objected to the time limits imposed on individual voir dire; therefore, nothing is preserved for our review. Tex. R.App.Proc. 52(a). The sixteenth point of error is overruled.

In points of error numbers eighteen through twenty-one, appellant complains of the admission into evidence of six written statements, to-wit: the original handwritten confession taken by Lancaster

police, the original typewritten version of that confession, photocopies of each, and his confessions to the two extraneous offenses admitted at punishment.[27] Appellant contends the statements were inadmissible because they were made based upon a promise from a Dallas County prosecutor that the State would seek the death penalty in this cause. In the twenty-second point of error, appellant claims the trial court erred in overruling his objections to the court's findings of fact and conclusions of law on the voluntariness of the statements. Appellant presents one argument for these points of error, and therefore, we address them together.

The trial judge held a hearing on the voluntariness of appellant's confessions, specifically 2A and 2.[28] After appellant's arrest in Austin on the capital murder warrant from Dallas County on October 24, 1986, he was transported to Lancaster by Lancaster police officers Turner and Merritt. Turner, who sat in the backseat with appellant, warned him of his rights at the commencement of the approximately three hour trip, and appellant responded (even though Turner did not question him) that he did not want talk about the offense just then. Later during the drive to Lancaster, appellant asked Turner in what county would his case be tried and who would be trying his case, and requested to speak to that prosecutor. Appellant indicated that he would discuss the facts of this offense and others if he was first allowed to speak with the prosecutor.

Appellant arrived at the Lancaster city jail at approximately 6:30 p.m. He was allowed to shower, change clothes, and use the bathroom; he was given a hot meal, water to drink as he requested, and cigarettes. The Lancaster police also filled a prescription which appellant received in Austin for an ankle injury he sustained in a scuffle with Austin police, and appellant took one tablet of the prescription. Par-

amedics also attended to the bandage on his ankle. Shortly after 8:00 p.m., Norman Kinne, Chief Felony Prosecutor for Dallas County at that time, arrived at the jail to speak with appellant. Kinne was briefed by police officers that appellant was willing to give a statement regarding the offense but wanted to talk with Kinne first about the death penalty. Kinne and appellant proceeded to the "interview room" where they spoke in private for three or four minutes. At the hearing, defense counsel questioned Kinne about that brief meeting:

Q. (defense counsel) Okay. Now, can you tell us what the conversation was between you and Mr. Long (appellant) in the room? What he said and what you said?

A. (Kinne) Mr. Long said, 'How do you feel about the death penalty?' And I said, 'Do you mean in this case?' And he said, 'Yes.' And I said, 'I think it's a good death penalty case.'[29] And he said, 'Good, that's what I want.' And I said, 'If that's what you want, we're going to try our best to get it for you.'

Q. Anything else, sir?

A. He said something to the effect, 'That's what I deserve because I can't live in this society.' Something like that. And then, I asked him if that was all, basically, and he said, 'Yes.' And I opened the door and the detectives came in.

Lancaster Detective Sergeant Matt Hunt then took the statements of which appellant now complains.

The trial judge made findings of fact and conclusions of law on the record at the conclusion of the pre-trial hearing. The court found *inter alia* no evidence to suggest appellant was "in any way coerced, threatened or promised anything or in the fashion one thinks of a promise." He further concluded appellant voluntarily requested to talk to Kinne and that the promise of seeking the death penalty was not a

---

27. The statements were State's Exhibits Nos. 3A, 3, 2A, 2, 81 and 107, respectively.

28. The arguments advanced at this hearing served the basis for the objection to the admissibility of each of the six statements.

29. Kinne testified at the hearing that he had some knowledge of the facts of this offense and on those facts he determined this case was "a good death penalty case."

promise that would induce appellant to testify. He stated in his findings and conclusions that appellant "testified he gave statements voluntarily and freely with knowledge and intelligence."[30] Thus, the trial judge ruled the statements were admissible before the jury. Defense counsel objected to the trial court's conclusions of law.

 Under our law, a promise will render a confession "involuntary" if it: (1) is positive; (2) is of some benefit to the accused; (3) is made or sanctioned by a person in authority; and (4) is of such character as would likely influence the accused to speak untruthfully. *Smith v. State*, 779 S.W.2d 417, 427 (Tex.Crim.App. 1989); *Fisher v. State*, 379 S.W.2d 900, 902 (Tex.Crim.App.1964). In reviewing a trial judge's conclusion on the voluntariness of a confession, this Court employs an abuse of discretion standard. The trial judge is the sole judge of the credibility of the witnesses in a pretrial hearing and absent a showing of an abuse of discretion the trial court's findings will not be disturbed. *Jacobs*, 787 S.W.2d 397, 400, citing *Freeman v. State*, 723 S.W.2d 727, 729 (Tex.Crim. App.1986), and *Nichols v. State*, 754 S.W.2d 185, 189 (Tex.Crim.App.1988).

This Court confronted this very same issue and factual circumstance in *Jacobs*, 787 S.W.2d at 399–400. There, the Court recognized that generally this area of confession law reflected fact situations where the State was accused of soliciting confessions in exchange for promises of leniency or special deals, rather than where the accused approaches the State for assurances that certain conditions be met before he confesses. The Court thus analyzed the appellant's claim that his confession was involuntary in light of his bargaining position. *Id.* at 399.

In *Jacobs*, the appellant offered to tell police about the capital murder offense and lead them to the deceased's body in exchange for an assurance that the State would seek the death penalty in his case. The appellant spoke with the district attorney who told him that "he would seek the death penalty if the evidence indicated that capital murder was the appropriate charge." *Id.* at 399–400. The Court analogized the case to *Freeman*, 723 S.W.2d 727, where the Court held the State's "promise" *not* to charge the defendant with capital murder was simply an assurance under the law and facts that no such charge would be made. The Court concluded, in *Jacobs*, the district attorney was constrained to seek an indictment that comported with the facts of the case, and thus, the appellant failed to show a positive and unequivocal promise to seek the death penalty had been made. *Jacobs*, 787 S.W.2d at 400.

The same is true in this cause. Appellant was willing to confess his commission of this capital murder, but he wanted to speak with the prosecuting attorney before making any statements. Kinne, the prosecutor, was aware of the circumstances of this offense prior to going to the Lancaster jail to meet appellant because he had previously discussed the progress of the investigation of this offense with officers. The trial judge made a finding of fact that Kinne, "having been apprised of the allegations[,] advised [appellant] that this seems like a good death penalty case and that the State would do everything that it could to go after 'that particular punishment." Kinne's statement reflects his learned opinion of the status of this case under the facts and the law, and was not a promise to seek the death penalty. The trial judge's findings of fact and conclusions of law on the voluntariness of appellant's confessions are well supported by the record and case law from this Court; thus, we find no abuse of discretion or any error in the trial

---

**30.** The record does not reflect that appellant testified at the pre-trial hearing although defense counsel considered calling him as a witness. Appellant did testify, however, regarding his confession during the guilt/innocence phase of trial. He stated he understood his rights, was not forced by Lancaster police to put anything in his statement, and that he voluntarily signed the typewritten copy. In response to defense counsel's question, however, appellant said he would not have signed his statement if Kinne had not assured him that the State would seek the death penalty in this case.

judge's overruling of appellant's objection to these findings and conclusions. The eighteenth through twenty-second points of error are overruled.

Appellant's next three points of error are also interrelated and allege jury charge error in regard to his voluntary statements.[31] In point of error twenty-three, appellant argues the trial judge materially erred in overruling his objections to the court's charge at guilt/innocence concerning his voluntary statements. In point of error twenty-four, he asserts the court committed fundamental error in the jury charge by failing to apply the law to the facts with respect to his statements. In the twenty-fifth point, appellant avers the trial court erred in overruling his two special requested jury charges concerning the voluntariness of his statements.

 Appellant requested, in the alternative, two jury charges on the voluntariness of his statement, to-wit:

You are instructed that under the law, a confession of a defendant made while he/she was in the custody of a peace officer shall be admissible in evidence if it appears that the same was freely and voluntarily made without compulsion or persuasion.

You are further instructed that unless you believe from the evidence beyond a reasonable doubt that the alleged confession or statement introduced into evidence was freely and voluntarily made and was made by the defendant without compulsion or persuasion or if you have a reasonable doubt thereof, you shall not consider such alleged statement or confession for any purpose nor any evidence obtained as a result.

Now if you find that the statement by Norman Kinne, First Assistant District Attorney of Dallas County, Texas, to

David Martin Long that the State of Texas would seek the death penalty in his case induced or persuaded him to give the statement, or have a reasonable doubt thereof, then you will not consider said statement for any purpose. If you do not so find, or have a reasonable doubt thereof, then you will consider said statement and give it whatever weight, if any, you deem fit.

or, in the alternative,:

You are instructed that under our law, a statement of a defendant made while the defendant was in jail or other place of confinement or in the custody of an officer shall be admissible in evidence if it appears that the same was freely and voluntarily made without compulsion or persuasion.

So, in this case, if you find from the evidence, or if you have a reasonable doubt thereof, that prior to the giving of the alleged statement of the defendant, if any, Norman Kinne, First Assistant District Attorney of Dallas, County, Texas, told the defendant before he made the statement, if any, that he would assure the defendant that the Dallas County District Attorney's Office would seek the death penalty, and that such statement by Norman Kinne, First Assistant District Attorney of Dallas County, Texas, was an inducement to the defendant to make and sign said statement, then you will wholly disregard said statement and you will not consider it as evidence for any purpose and not consider any evidence obtained as a result thereof.

The trial judge overruled these instructions and instructed the jury as follows:

You are instructed that under the law, a confession of a defendant made while he/she was in the custody of a peace officer shall be admissible in evidence if

---

**31.** There are six statements to which appellant is referring. Those statements are the original handwritten confession taken by Lancaster police, the original typewritten version of that confession, photostatic copies of each of those confessions, and appellant's confessions to the two extraneous offenses.

The State correctly asserts in its brief that no error is preserved under these points of error as to appellant's two statements regarding the extraneous offenses because those statements were admitted only at the punishment phase.

The remaining four statements are substantially the same, and we therefore address these points of error by generally referring to "appellant's statements" rather than specifically addressing each one.

it appears that the same was freely and voluntarily made without compulsion or persuasion.

You are instructed that unless you believe from the evidence beyond a reasonable doubt that the alleged confession or statement introduced into evidence was freely and voluntarily made and was made by the defendant without compulsion or persuasion or if you have a reasonable doubt thereof, you shall not consider such alleged statement or confession for any purpose nor any evidence obtained as a result.

This instruction substantially comports with appellant's requested instruction, save its failure to apply the law on voluntariness of confessions to the specific facts surrounding appellant's giving of his statements.

Assuming *arguendo* appellant was entitled to either of his requested instructions under Art. 38.22, §§ 6 and 7, V.A.C.C.P.[32], the trial court's failure to give the requested instruction was harmless. Prior to the admission of these statements at trial, appellant changed his not guilty plea to guilty before the jury. Appellant told the jury he "knowingly and intentionally took the lives of those three women." Later at trial, appellant testified and again admitted committing this offense. In light of these admissions of guilt before the jury, we conclude any error in failing to apply the law

on voluntariness of confessions to the facts of this case was harmless. *Arizona v. Fulminante*, — U.S. —, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991) (admission of coerced confession may be harmless error). Points of error 23–25 are overruled.

■ Appellant next complains of the court's jury charge at punishment. In point of error number 26, appellant contends the trial court erred in overruling his objections to the court's charge as to the definitions of deliberate, delirium tremens, and "the term insanity as defined and 'delirium tremens' as a species of insanity." In point of error number 27, he argues the trial court erred in overruling his special requested instructions with respect to the term deliberate, delirium tremens as a species of insanity, and insanity in the sense that as a result of intoxication appellant did not know his conduct was wrong. From reviewing the record, we find no error is preserved under either point of error as to the term deliberate even though appellant initially objected to the lack of a definition of the term and submitted a definition. The record reflects appellant later accepted[33] the court's charge on "deliberate" and consequently abandoned his objections. Therefore, we will only consider the insanity and delirium tremens issues.

As noted in footnote 33 *supra*, appellant

---

32. Article 38.22, Sec. 6, addresses "all cases where a question is raised as to the voluntariness of a statement of an accused." Section 6 provides in pertinent part that:

Upon the finding by the judge as a matter of law and fact that the statement was voluntarily made, evidence pertaining to such matter may be submitted to the jury and it shall be instructed that unless the jury believes beyond a reasonable doubt that the statement was voluntarily made, the jury shall not consider such statement for any purpose nor any evidence obtained as a result thereof.

Germane to section 6 is section 7 of this article, which provides:

When the issue is raised by the evidence, the trial judge shall appropriately instruct the jury, generally, on the law pertaining to such statement.

33. The State suggests in its brief that appellant "excepted" to the court's charge on "deliberate" rather than "accepted" it. The record is clearly

to the contrary. After an off-the-record discussion was had, the following transpired:

THE COURT: Okay. Let's try it again. Mr. Cunningham (defense counsel), other than those objections that you have made with regards to the insanity and delirium tremens, is there any other objections that the defense would like to make to this charge?

MR. CUNNINGHAM: None, Your Honor. And so that the record is correct, we would like the record to reflect that we are accepting the charge on deliberate which the Court previously read.

We are asking that the Court separately charge the jury that the following two phrases—paragraphs be included in the Court's charge.

By the term insanity as used herein is meant that as a result of intoxication, the defendant did not know that his conduct was wrong.

Delirium tremens is a species of insanity. . . .

requested two instructions [34]: (1) the term "insanity" means that as a result of intoxication, the defendant did not know that his conduct was wrong; and (2) "delirium tremens" is a species of insanity. Instead of these requested instructions, the trial judge charged the jury the following:

You are instructed that under our law, neither intoxication nor temporary insanity of mind caused by intoxication shall constitute any defense to the commission of crime. Evidence of temporary insanity caused by intoxication may be considered in mitigation of the penalty attached to the offense.

By the term "intoxication" as used herein is meant disturbance of mental or physical capacity resulting from the introduction of any substance into the body.

Now if you find from the evidence that the defendant, David Martin Long, at the time of the commission of the offense for which he is on trial, if you find from the evidence beyond a reasonable doubt that he did commit such offense, was laboring under temporary insanity as defined in this charge, produced by voluntary intoxication, then you may take such temporary insanity into consideration in mitigation of the penalty which you attach to the penalty (sic), and if it aids you in answering the three special issues submitted to you herein.

Although worded somewhat differently, the court's charge is in accordance with the provisions of § 8.04, entitled Intoxication, which provide:

(a) Voluntary intoxication does not constitute a defense to the commission of crime.

(b) Evidence of temporary insanity caused by intoxication may be introduced by the actor in mitigation of the penalty attached to the offense for which he is being tried.

(c) When temporary insanity is relied upon as a defense and the evidence tends to show that such insanity was caused by intoxication, the court shall charge the jury in accordance with the provisions of this section.

(d) For purposes of this section 'intoxication' means disturbance of mental or physical capacity resulting from the introduction of any substance into the body.

The court's charge was proper in light of the provisions of § 8.04.

The punishment charge, however adequate in addressing § 8.04 concerns, fails to define "insanity" as provided for in Penal Code § 8.01(a), although the charge refers to "temporary insanity as defined in this charge." However, this failure to define insanity in the charge on punishment was harmless. Pursuant to Art. 46.03, V.A.C.C.P., appellant properly filed notice of his intention to present evidence of the insanity defense. At the guilt/innocence phase of trial, the trial judge properly charged the jury on the law and definition of insanity as provided in § 8.01. In his jury charge at punishment, the trial judge also instructed the jury that it may take into consideration the evidence admitted during the full trial, the law submitted to it in the punishment charge, *and* the law in "the charge heretofore given to you by the Court," i.e., the charge at guilt/innocence. Thus, the instructions on insanity in the jury charge at guilt/innocence were incorporated by reference into the jury charge at punishment. In light of this record, the trial court's failure to again define "insanity" in the jury charge was harmless. *Almanza v. State*, 686 S.W.2d 157 (Tex.Crim. App.1984).

As to the "delirium tremens" issue, we conclude that the trial judge did not err in denying appellant's requested instruction. There was testimony at trial from appellant and a forensic psychologist regarding appellant's extensive use of drugs and alcohol and his psychological problems. To direct the jury's considera-

---

**34.** An accused is entitled to a jury instruction on every defensive or mitigating issue raised by the evidence. *Arnold v. State*, 742 S.W.2d 10, 13 (Tex.Crim.App.1987), and cases cited therein.

The State did not contest at trial, nor does it do so here, that there was no evidence raising these issues.

tion to the testimony on delirium tremens would be an improper comment on the evidence. Thus, the trial judge correctly denied appellant's requested instruction. *Bell v. State*, 582 S.W.2d 800, 812 (Tex. Crim.App.1979). Points of error twenty-six and twenty-seven are overruled.

Appellant asserts in point of error twenty-eight that the trial judge erred in overruling his motion for change of venue. Appellant filed his motion, supported by affidavits, in compliance with Art. 31.-03(a)(1), V.A.C.C.P., and the State filed a controverting affidavit, as provided in Art. 31.04, V.A.C.C.P. The trial judge conducted a hearing on the motion at which both sides presented evidence. The trial judge delayed his ruling on the motion until after viewing the exhibits but before conducting the voir dire. We have reviewed the record from the venue hearing and the exhibits germane to that hearing. In light of this Court's earlier decisions[35] in *Beets v. State*, 767 S.W.2d 711 (Tex.Crim.App.1987) (Opinion on Rehearing), *cert. denied*, 492 U.S. 912, 109 S.Ct. 3272, 106 L.Ed.2d 579, *McGee*, 774 S.W.2d 229, and *DeBlanc*, 799 S.W.2d 701, we conclude the trial judge did not abuse his discretion in denying appellant's motion for change of venue. Point of error twenty-eight is overruled.

In point of error number twenty-nine, appellant complains the trial judge erred in overruling his objection to the State's hypothetical question, based upon exhibits not admitted into evidence, to a psychiatrist witness as to his opinion of appellant's mental status at the time of the alleged offense. At trial, after the prosecutor concluded his hypothetical question, defense counsel objected to certain facts included in the question. In response to two objections, the prosecutor withdrew the objectionable facts from his hypothetical and the witness informed the court he could disregard those facts in making his analysis. The trial judge overruled a third objection to the prosecutor's characterization that ap-

pellant "fled" to Mississippi after the offense. None of the objections at trial, however, was based upon "exhibits not in evidence." Since the trial objection does not comport with the complaint on appeal, nothing is preserved for our review. *Johnson v. State*, 803 S.W.2d 272, 292 (Tex. Crim.App.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 2914, 115 L.Ed.2d 1078 (1991). In the thirtieth point of error, appellant contends the court erred in overruling his objection during the guilt/innocence phase of trial to the psychiatrist's opinion as to appellant's propensity for future dangerousness based upon the same exhibits in point of error twenty-nine. Appellant failed to object at trial to this hypothetical question; therefore, nothing is preserved for our review. Points of error twenty-nine and thirty are overruled.

Appellant argues in his thirty-first point of error that the trial court abused its discretion by refusing to excuse prospective jurors whom he and the State had agreed to excuse. In point of error number thirty-two appellant specifically names the three prospective jurors who were not excused by the trial judge pursuant to the parties' agreement. Appellant argues these points together and asserts that the trial court's failure to excuse these prospective jurors "constituted an impairment of [his] right in the use of his peremptory challenges" as he was required to use a peremptory challenge to prevent these persons from serving on his jury. The record reflects, however, appellant did not exercise a peremptory challenge on any of these designated prospective jurors. Therefore, appellant suffered no harm in the trial court's refusal to excuse these prospective jurors, and points of error thirty-one and thirty-two are overruled.

In points of error numbers thirty-three through thirty-five, appellant complains the trial court reversibly erred in shackling him during trial.[36] Prior to the

---

35. These decisions adequately discuss the applicable law and to address this point of error in greater detail would do nothing to add to the jurisprudence of this State.

36. One argument is presented for these three interrelated points of error. The exact points argued are:
Point of Error No. 33: The trial court materially erred and abused its discretion in shack-

jury being selected, defense counsel objected to the use of shackles on appellant during voir dire and trial in that it was inflammatory and prejudicial. The trial judge overruled the objection and instructed the bailiffs to "use whatever you feel in the interest of safety is required for security." After the jury was chosen and before the pre-trial hearing on appellant's motion to suppress his confession, defense counsel again objected to appellant having to wear shackles on his legs and noted appellant had obeyed the deputies. The trial judge again overruled the objection but agreed with defense counsel that appellant had been well-behaved.[37] In overruling the objection and in exercising its discretion to shackle appellant, the court considered the seriousness of the charge against appellant, "the type of trial this is," and the necessity for security. He also stated for the record that appellant had been wearing these shackles since voir dire. The trial judge advised counsel that they could block the shackles from the jury's view by placing their briefcases in front of appellant's feet and by advising appellant not to cross his legs, an action which he had "previously done on occasions," causing his shackles to be visible. Otherwise, according to the record, the layout of the courtroom was such that appellant's feet were before a table which blocked the jury's view of the shackles.

The harm a defendant suffers when the jury sees him in handcuffs or shackles is that his constitutional presumption of innocence is infringed, *Marquez v. State*, 725 S.W.2d 217, 227 (Tex.Crim.App. 1987), citing *Moore v. State*, 535 S.W.2d 357, 358 (Tex.Crim.App.1976), and all efforts should be maintained to prevent the jury from seeing the defendant in shackles, except where there has been a showing of exceptional circumstances or a manifest need for such restraint. *Clark v. State*, 717 S.W.2d 910, 919 (Tex.Crim.App.1986), and cases cited therein. It is within the discretion of the trial judge as to whether a defendant shall be tried in handcuffs or shackles. *Jacobs*, 787 S.W.2d 397, 407, citing *Marquez*, 725 S.W.2d at 227. On appeal, the appellate court determines whether the trial court abused its discretion by requiring the defendant to appear in restraints.[38] To assist the appellate court in this determination, the record must clearly and affirmatively reflect the trial judge's reasons therefor. *Id.*

In *Marquez*, 725 S.W.2d 217, this Court held the trial judge's findings in the record amply supported his decision to have the defendant shackled during the punishment phase of trial. In that case, the record reflected *inter alia* the defendant had already been convicted of capital murder, had carried deadly weapons in prison, choked and stabbed fellow inmates, attacked and spit on cameramen, and threatened to run

---

ling the appellant during the trial of this case, when he had not been disruptive in any manner or demonstrated in any way.

Point of Error No. 34: Appellant's right to a fair and impartial trial guaranteed to him by the Sixth Amendment to the United States Constitution and the Texas Constitution was denied by his being shackled during the voir dire examination, guilt or innocent (sic) and punishment phase of the trial.

Point of Error No. 35: The trial court materially erred and abused its discretion in permitting the shackling of the appellant during the voir dire examination, guilt or innocent (sic) phase and punishment phase of the trial in this case.

**37.** Prior to this objection, appellant's counsel objected to the presence of a *uniformed* bailiff in the courtroom. Counsel argued the bailiff's presence was prejudicial because it gave the

jury the impression that appellant "is getting ready to do something, in addition to what he's charged with." The trial judge overruled this objection because the bailiff was a deputy sheriff on duty and wearing the appropriate uniform, and the trial judge noted that appellant was charged with "the most horrendous crime" and faced the death penalty. The court also stated, however, that appellant had been "a beautiful person" and had not posed any problems in the trial thus far, but the trial judge had known persons to act very calm and peaceful and then turn.

**38.** This principle also applies to witnesses who are required to appear in restraints or jail uniforms. *See Thompson v. State*, 514 S.W.2d 275 (Tex.Crim.App.1974) (no abuse of discretion where Dallas County prisoners called as witnesses by co-defendant testified in jail uniforms and handcuffs).

and cause police officers to have to shoot and kill him. Given these explicit reasons, the Court found no abuse of discretion by the trial judge. Likewise, in *Jacobs*, 787 S.W.2d at 407, we found the record was well developed on this issue, and the trial court did not abuse its discretion in requiring leg restraints during trial. The trial judge heard evidence from both the defendant and the State on whether the defendant was prejudiced when potential jurors saw him wearing the restraints. The trial judge found the defendant had crossed his legs in such a manner as to expose the restraints to some jury members, that an aperture in the spectator rail allowed exposure of the restraints to the jury, that steps were taken before voir dire to insure that no juror saw the restraints and, in fact, no juror indicated during voir dire that he had seen them, that the defendant had a history of escapes, and that he had an expressed wish to die rather than be incarcerated for life. This Court found no abuse of discretion and no prejudice suffered by the defendant as a result of potential jurors possibly seeing him restrained. *Id.*

In the present cause, the trial judge did not make specific findings of fact justifying the use of shackles, but rather stated in the record general concerns regarding security because appellant was charged with capital murder. Indeed, the facts of this case are brutally violent, but there is no other evidence in the record of violence or threatened violence by appellant *during this trial.*[39] The fact that a person is *charged* with the most serious of felonies cannot override that person's constitutional presumption of innocence. Moreover, the trial judge noted that appellant had been well-behaved during pre-trial proceedings. While the trial judge's concern with security during trial is certainly admirable, we find that these reasons are not sufficiently specific to support the judge's decision to have appellant shackled from the commencement of his trial. Thus, on the basis of this record, we hold the trial judge

abused his discretion in shackling appellant prior to trial.

We further hold, however, that this abuse of discretion did not prejudice or harm appellant. While appellant was shackled throughout his trial, even while testifying, he fails to direct our attention to any place in the record showing that the jury actually saw the shackles. The trial judge took measures to prevent the exposure of the jury to the shackles, and in fact, during trial, the jury was excused each time appellant took the witness stand and was excused therefrom. The only reference to the visibility of the shackles came from the trial judge when addressing defense counsel during a pre-trial hearing, to-wit:

> The layout of this courtroom in relationship to the jury box, the defendant's feet are before a table which blocks the view of the jury to see his shackles. If they were to see his shackles, it would only be because he put them in a position to be seen, such as he has previously done on occasions, crossed his legs, which caused the shackles to be visible.

Therefore, we cannot conclude appellant was harmed in any respect by the use of the shackles. *See Clark*, 717 S.W.2d at 919 (although some jurors saw defendant handcuffed outside courtroom, no evidence jurors discussed it or that it influenced their decisions on guilt and punishment); *Lucas v. State*, 791 S.W.2d 35 (Tex.Crim. App.1989) (admission before jury of videotape where defendant is handcuffed is harmless error under Tex.R.App.Proc. 81(b)(2)). Points of error numbers 33, 34, and 35 are overruled.

Finding no merit in appellant's points of error, we affirm the trial court's judgment.

McCOMICK, P.J., and CLINTON and BENAVIDES, JJ., concur in the result.

MALONEY, Judge, dissenting.

Absent evidence in the record that the appellant was a contumacious defendant

---

**39.** At trial, appellant later testified that he would kill again, even in prison, and that he did not want to die but that there was no treatment which would cure his chemical dependency and

associated mental illnesses. At the time the trial judge made his decision regarding security measures, he did not have the benefit of this testimony.

and that shackles during the proceedings were necessary to control him, like the majority, I would hold that shackling the appellant was error. Unlike the majority, I would find that compelling the appellant to wear shackles during the voir dire of the venire and during the trial violates the defendant's right to a fair and impartial trial guaranteed to him by the Sixth and Fourteenth Amendments to the federal constitution and is reversible error.

In the case of *Illinois v. Allen*, 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970), although the Court authorized the use of shackles under the most severe of circumstances, the Court stated:

> But even to contemplate such a technique, much less see it, arouses a feeling that no person should be tried while shackled and gagged except as a last resort. Not only is it possible that the sight of shackles and gags might have a significant effect on the jury's feelings about the defendant, but the use of this technique is itself something of an affront to the very dignity and decorum of judicial proceedings that the judge is seeking to uphold.

And, Mr. Justice Brennan, concurring at page 363, pointed out that "no action against an unruly defendant is permissible except after he has been fully and firmly informed that his conduct is wrong and intolerable and warned of the possible consequences of continued misbehavior".

In *Estelle v. Williams*, 425 U.S. 501, 96 S.Ct. 1691, 48 L.Ed.2d 126 (1976), the Supreme Court recognized that even the wearing of prison garb by the defendant during trial should not be compelled "because of the possible impairment of the presumption [of innocence] so basic to the adversary system ... that the constant reminder of the accused's condition ... may affect a juror's judgment ... [and that] an unacceptable risk is presented of impermissible factors coming into play." *Id.* at 505, 96 S.Ct. at 1693, citing *Turner v. Louisiana*, 379 U.S. 466, 473, 85 S.Ct. 546, 550, 13 L.Ed.2d 424 (1965).

Placing the burden on the defendant to show that the jury could see the shackles and that the jury was influenced by that fact in order to present error, refutes the requirement of the harmless error doctrine that the State establish beyond reasonable doubt that the error was harmless.

It is to be emphasized that this is a capital murder trial where death was assessed and that a prerequisite of that assessment was that the jury answer in the affirmative:

> whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society.

What better evidence could there be to show dangerousness than to have the defendant shackled while being tried?

For the above reasons and because I believe that this case establishes an extremely unfair precedent, I respectfully dissent.