IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






AP-75,119





TAICHIN PREYOR, Appellant



v.
 


THE STATE OF TEXAS





ON DIRECT APPEAL


FROM CAUSE NO. 2004-CR-3602 IN THE 290TH DISTRICT COURT

BEXAR COUNTY





 PRICE, J., delivered the opinion of the Court in which Keller, P.J., and
Womack, Johnson, Keasler, Hervey, Holcomb and Cochran, JJ., joined. 
Meyers, J., did not participate.


O P I N I O N


 

 The appellant was convicted in March 2005, of capital murder. (1) Based on the jury's
answers to the special issues set forth in Texas Code of Criminal Procedure Article 37.071,
sections 2(b) and 2(e), (2) the trial judge sentenced the appellant to death. (3) Direct appeal to this
Court is automatic. (4) After reviewing the appellant's six points of error, we find them to be
without merit. Consequently, we affirm the trial court's judgment and sentence of death.

STATEMENT OF FACTS 

 The evidence showed that the appellant, also known as "Box," murdered Jami
Tackett in the course of committing or attempting to commit burglary of a habitation on
February 26, 2004. The appellant was friends with Tackett, who sold drugs and kept cocaine
in a safe in her apartment. The appellant called Tackett earlier in the evening and said he
was coming over to her apartment that night. Tackett and some friends, including Jason
Garza, partied at her apartment into the early morning hours. The last guest left at about
4:00 a.m., at which point Tackett and Garza locked the front door, turned out the lights, and
went to bed. Shortly thereafter, the appellant, who was dressed from head to toe in black
clothing, broke through the front door and entered Tackett's bedroom. Tackett asked, "Box,
what the hell are you doing here?" The appellant said, "Fuck this," then jumped on the bed
and began attacking Garza. The appellant stabbed Garza, who managed to run away and
asked neighbors to call for help, leaving Tackett alone with the appellant. The appellant
then stabbed Tackett numerous times and slashed her throat, severing her trachea, jugular
vein, and carotid artery. The appellant initially tried to leave the scene in his car, which was
parked downstairs, but he went back into Tackett's apartment, where he apparently searched
for his car keys while Tackett struggled to breathe on her living-room floor. He encountered
the police when he went back downstairs, and he failed to comply when they ordered him
to stop and get on the ground. The officers struggled to handcuff the appellant, who was
covered in blood, and used pepper spray to subdue him. Tackett died before the paramedics
arrived. Police discovered a loaded shotgun on the bumper of the appellant's car and a knife
and gloves in the grass nearby. 

 The State introduced evidence at the punishment phase that the appellant had
committed a prior drug offense in Syracuse, New York, in 1999. Syracuse Police Officer
Tim Laun testified that he had noticed the appellant and another man acting suspiciously at
2:00 a.m. He did a pat-down search of the appellant and discovered that he had a bag
containing nearly four ounces of crack cocaine. (5) The appellant fled, and another officer later
tackled and handcuffed him. The appellant pleaded guilty to possession of a controlled
substance in exchange for a one-year sentence. A charge of resisting arrest was dismissed
as part of his plea bargain. He told his probation officer that he had used cocaine since
adolescence, and that he had started using it consistently in 1998, when he had an affair with
a woman who was a drug abuser.

 The appellant also told his probation officer that the crack cocaine was for his own
personal use. However, when he was interviewed by clinical psychologist Dr. Joanne
Murphy prior to his capital-murder trial, he acknowledged that he had been selling drugs. 


 After serving time for his drug offense, the appellant moved to San Antonio, where
he was joined by his wife and children. About one month before the instant offense, on
January 14, 2004, the police went to the appellant's apartment on a "family violence call." 
The appellant was angry that police were there, and he was pacing, yelling, and screaming. 
He calmed down when his brother, a San Antonio police officer, arrived. His wife, who was
"very pregnant" with their fourth child, did not appear to be injured and stated that she did
not need assistance.

 The appellant committed the following disciplinary infractions while in the Bexar
County Jail awaiting trial: (1) possessing ten tablets of Tylenol, instead of the two tablets
permitted; (2) disobeying an order from staff; and, (3) engaging in "loud, boisterous behavior
or communication with other inmates" by lifting the lid on his cell door. The evidence also
showed that the appellant had the dates of his drug offense and the instant capital murder
tattooed on his body. He told Dr. Murphy that the tattoos were to remind him of mistakes
that he never wanted to repeat.

GUILT/INNOCENCE POINTS OF ERROR

 In his first point of error, the appellant contends that the trial court erred in overruling

his Batson challenge to the State's peremptory challenge of prospective juror April Keisha
Layne. (6) A defendant objecting under Batson must make a prima facie showing of racial
discrimination in the State's exercise of its peremptory strikes. (7) The burden then shifts to the
State to articulate race-neutral explanations for its strikes. (8) Once the prosecutor has
articulated race-neutral explanations, the burden shifts back to the defendant to show that
the explanations are really a pretext for discrimination. (9) The trial court must then determine
whether the defendant has carried his burden of proving discrimination. (10) The trial court's
determination is accorded great deference and will not be overturned on appeal unless it is
clearly erroneous. (11)

 The appellant objected to the State's peremptory strike against Layne under Batson. 
Without making a finding that the appellant had made a prima facie case, the trial court
entertained the State's explanations for the strike:

 THE COURT: . . . So, you want to tell me why you struck Ms. Layne,
who happens to be a black woman?


 [PROSECUTOR]: Yes. Judge, I'm happy to tell you but I think first
there has to be a pattern. There's certainly no pattern that we are striking all
Blacks off the panel. I have her rated actually fairly low based on her answers
on the questionnaire. I have a concern still with her stepbrother having been
accused of a felony. She indicates in her questionnaire that she had gone with
him to an attorney to discuss the case with the attorney, but at this point she's
not being real forthcoming on what the felony actually was. Her questions in
this case, also, when she was responding to the first question.


 And I asked her if she thought that the capital murder itself, whether
that could certainly prove the first special issue to her depending on the facts. 
She seems to have a real hangup with that. That caused me concern that she
couldn't envision that sort of case where that first question could be answered
simply by - - you know, by her hearing the evidence in the first part of the
case. So, all of those things together have made me believe she is an
appropriate strike for the State in this case. 


When questioned further by defense counsel, the prosecutor also explained:

Q. How are her answers different from the other - - With respect to every
question that you feel upset about, how does her answer differ from the
answers of other jurors which you have found acceptable?


A. Most of the other jurors have not had a problem with answering the
first special issue yes or not hesitated like she did in answering [the]
special issue yes, based on the facts of the offense.


Q. What were the specific words that caused you pause when she said
yes?


A. I believe she hesitated for a couple of seconds and said, you're really
going to have to show me something. It's hard to explain exactly the
words, but it was clear that she made quite a pause and seemed to
indicate that we were going to have to bring her something more than
the facts itself.


Q. Now, she doesn't say that, does she, specifically?


A. I don't remember her exact words, but it was clear to me that's what
she meant.


After questioning the prosecutor, defense counsel stated, "Your Honor, I do not believe that
the State has given a racially neutral reason and carried the burden of persuasion on this. I
move to go ahead and seat Ms. Layne." The trial court responded, "Well, I'll take [the
prosecutor] at his word that he didn't factor race into his decision to use a strike on this
woman. So, you may tell her that she can go." 

 The State's facially race-neutral explanations for striking Layne are supported by the
record. When the prosecutor questioned Layne about her stepbrother, she stated, "I think it
was like a drug case," and, "I can't tell you like details." When the prosecutor asked her if
"just a capital murder itself could give [her] the answer" to the future dangerousness special
issue, she replied, "It could, but you would need to really listen to the case." Although we
cannot determine from the record how long Layne paused before answering that question,
we defer to the trial court's acceptance of the State's explanation. The appellant did not
show that the State's explanation was really a pretext for discrimination. The trial court did
not abuse its discretion in denying the appellant's Batson challenge. Point of error one is
overruled. 

 In point of error two, the appellant complains that the trial court erroneously admitted
State's Exhibits 125 and 126, in violation of Rule 403 of the Texas Rules of Evidence. He
argues that these autopsy photographs "were extremely gruesome and detailed," that they
were cumulative, and that their probative value was substantially outweighed by the danger
of unfair prejudice. 

 Rule 403 requires that a photograph have some probative value and that its probative
value not be substantially outweighed by its inflammatory nature. (12) A court may consider
many factors in determining whether the probative value of photographs is substantially
outweighed by the danger of unfair prejudice. These factors include: the number of exhibits
offered, their gruesomeness, their detail, their size, whether they are in color or black-and-white, whether they are close-up, whether the body depicted is clothed or naked, the
availability of other means of proof, and other circumstances unique to the individual case. (13) 
The admissibility of photographs over an objection is within the sound discretion of the trial
judge. (14) Autopsy photographs are generally admissible unless they depict mutilation of the
victim caused by the autopsy itself. (15) 

 State's Exhibits 125 and 126 appear in the record as color photographs that are
slightly larger than 5" by 7" in size. They offer close-up views of open incised wounds to
the victim's neck and near her ear. When the appellant objected to the admission of these
photographs, the prosecutor responded that State's Exhibit 125 showed "injuries to the ear
that are not apparent on other photos" and that State's Exhibit 126 "assists in showing the
pathway of the injury." The trial court replied:

 THE COURT: Well, it seems that you have others that do the same
thing - - 122, 124. I don't see how they are particularly different. No, this is
the ear, 126.


 [PROSECUTOR]: Specifically, Judge, if you would look at where the
wounds end near the ear in 125 as opposed to 124 and 122, that's the
significance.


 THE COURT: Pick one.


 [PROSECUTOR]: Between the three, Your Honor, because 122 also
shows chest wounds that are not shown in the others. Your Honor, then
between the three, 125 is the one that we would submit.


 THE COURT: All right. Well, I'm going to overrule your objections
to 125 and 126 and receive those into evidence, and 124 and 122 are pretty
much the same thing, so those are not coming in. The rest are admitted.


 The trial court did not abuse its discretion in admitting the photographs. Although the
photographs depict the bloody stab wounds suffered by the victim, they portray no more than
the gruesomeness of the injuries inflicted. (16) They were not cumulative, despite the fact that
some of the other admitted photographs also showed the injuries to the victim's neck and
near her ear. The wounds in the other admitted photographs were glued closed so that the
medical examiner could better see their pathway or pattern and could better determine if the
edges of the wounds were "pointed or blunted." Finally, the danger of unfair prejudice did
not substantially outweigh their probative value. The photographs were relevant and
probative to the jury's understanding of the victim's injuries. Point of error two is overruled. PUNISHMENT POINTS OF ERROR

 In point of error three, the appellant argues that the evidence is legally insufficient to
support the jury's affirmative finding on the "future dangerousness" special issue. We view
the evidence in the light most favorable to the jury's finding and determine whether any
rational trier of fact could have found beyond a reasonable doubt that there is a probability
that the appellant would commit criminal acts of violence that would constitute a continuing
threat to society. (17) The facts of the offense, alone, can be sufficient to support an affirmative
answer to the special issue. (18)

 The appellant argues on appeal that "the psychological testimony was favorable" and
indicated that he would not be a future danger in prison. However, Dr. Murphy
acknowledged on cross-examination that she did not consider the circumstances of the
instant case and instead relied upon the appellant's school records and what the appellant
and his attorney reported to her. The appellant argues that the jail records and the testimony
of jail personnel showed that the appellant was "not a problem inmate." But the evidence
showed that the appellant twice resisted arrest and had an angry reaction when police came
to his home on a family-violence call. Further, Bexar County Sheriff's Deputy Mike
Alvarado testified that, about a week prior to trial, a prison guard searched the appellant's
cell for "non-privileged mail" and the "Special Response Team" (or "SERT team") was
dispatched to assist in the matter. Alvarado acknowledged on cross-examination that "there
had been sort of an escalation" before the "SERT team" was called and that "there was a lot
of tension."

 The appellant brutally murdered Tackett and seriously wounded Garza. The way in
which he killed Tackett, by stabbing her multiple times and slitting her throat, was
particularly violent. The circumstantial evidence indicated that the offense was
premeditated. Further, the appellant resisted the police when they tried to arrest him, as he
had done at another time in the past. The evidence, viewed in the light most favorable to the
jury's finding, was such that any rational trier of fact could have found beyond a reasonable
doubt that there is a probability that the appellant would commit criminal acts of violence
that would constitute a continuing threat to society. Point of error three is overruled.

 In his fourth point of error, the appellant challenges the admission of "his 1999 drug
conviction and related resisting arrest charge" at the punishment phase. He asserts that the
conviction and charge "were clearly the result of a Fourth Amendment violation" because
the officers did not have reasonable suspicion to stop and search him.

 The trial court has wide latitude in admitting or excluding evidence of extraneous
offenses at the punishment stage of a capital trial. (19) The trial court has the discretion to
admit any evidence relevant to the jury's determination of a capital defendant's
deathworthiness, including evidence of adjudicated or unadjudicated extraneous offenses. (20) 
The State's burden is to "clearly prove" that the extraneous offense was committed and that
the appellant was the perpetrator. (21) Here, by introducing the judgment of conviction and
presenting the testimony of police officers, the State clearly proved that the appellant
possessed a controlled substance and resisted arrest in New York in 1999. Now the
appellant makes an impermissible collateral attack upon that prior conviction. (22) Point of
error four is overruled. 

 In point of error five, the appellant claims that the trial court erroneously denied his
request "to not instruct the jury that mitigating evidence is evidence that reduces the
appellant's moral blameworthiness." In point of error six, he argues that the trial court
erroneously denied his request to instead define "mitigating evidence" as "any evidence that
may serve as a basis for a sentence less than death, regardless of whether the defendant is
able to establish a nexus between the evidence and the commission of the crime."

 Pursuant to Article 37.071, the trial court instructed the jury that it "shall consider
mitigating evidence to be evidence that a juror might regard as reducing the defendant's
moral blameworthiness." (23) The appellant claims that this statutory definition is contrary to
the United States Supreme Court decisions in Smith v. Texas, 543 U.S. 37 (2004), and
Tennard v. Dretke, 542 U.S. 274 (2004). He asserts that this definition "leads a reasonable
juror to believe that the juror cannot consider evidence as mitigating unless it reduces the
defendant's blame." He further alleges that this definition "also requires a nexus between
the evidence and the circumstances of the offense since the definition requires the evidence
to reduce the defendant's blame for the offense before it can be considered as mitigating."

 We have decided this claim adversely to the appellant in previous cases. (24) In Perry,
we specifically stated that the mitigation special issue does not unconstitutionally narrow the
jury's discretion to factors concerning only moral blameworthiness and that the Supreme
Court's Tennard decision, which was decided under another statutory scheme that did not
include the mitigation special issue, does not hold otherwise. (25) Points of error five and six
are overruled. We affirm the judgment of the trial court.


Delivered: January 23, 2008

Do Not Publish 
1. Tex. Penal Code § 19.03(a).
2. Unless otherwise indicated, all references to Articles refer to the Texas Code of Criminal
Procedure.
3. Art. 37.071, § 2(g).
4. Art. 37.071, § 2(h). 
5. Laun testified that this amount of crack cocaine would sell for approximately $10,000.
6. Batson v. Kentucky, 476 U.S. 79 (1986). 
7. Herron v. State, 86 S.W.3d 621, 630 (Tex. Crim. App. 2002); Mathis v. State, 67 S.W.3d
918, 924 (Tex. Crim. App. 2002). 
8. Id.
9. Id. 
10. Id. 
11. Id. 
12. Tex. R. Evid. 403; Long v. State, 823 S.W.2d 259, 272 (Tex. Crim. App. 1991). 
13. Long, 823 S.W.2d at 272; Santellan v. State, 939 S.W.2d 155, 172 (Tex. Crim. App. 1997). 
14. Sonnier v. State, 913 S.W.2d 511, 518 (Tex. Crim. App. 1995).
15. Santellan, 939 S.W.2d at 172; Burdine v. State, 719 S.W.2d 309, 316 (Tex. Crim. App.
1986).
16. Narvaiz v. State, 840 S.W.2d 415, 429 (Tex. Crim. App. 1992). 
17. Jackson v. Virginia, 443 U.S. 307 (1979). 
18. Allridge v. State, 850 S.W.2d 471, 488 (Tex. Crim. App. 1991).
19. Art. 37.071, § 2(a); Hughes v. State, 24 S.W.3d 833, 843 (Tex. Crim. App. 2000). 
20. Id.; Powell v. State, 898 S.W.2d 821, 830 (Tex. Crim. App. 1994). 
21. Hughes, 24 S.W.3d at 843; cf. Hunter v. State, No. AP-74,983, ___ S.W.3d ___ (Tex. Crim.
App. November 7, 2007)(stating there is no error in not having a burden-of-proof instruction
concerning extraneous offenses as long as the punishment charge properly requires the State to
prove the special issues, other than mitigation and affirmative defenses, beyond a reasonable
doubt). 
22. See Stone v. Powell, 428 U.S. 465, 493 (1976) ("[T]he additional contribution, if any, of
the consideration of search-and-seizure claims of state prisoners on collateral review is small in
relation to the costs.").
23. Art. 37.071, § 2(f). 
24. Roberts v. State, 220 S.W.3d 521, 534 (Tex. Crim. App.), cert. denied, 128 S. Ct. 282
(2007); Perry v. State, 158 S.W.3d 438, 449 (Tex. Crim. App. 2004), cert. denied, 546 U.S. 933
(2005). 
25. Id.