COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

OSCAR RICARDO TOVAR, §

Appellant, §

v. §

THE STATE OF TEXAS, §

Appellee. §

§

No. 08-06-00157-CR

Appeal from the

291st District Court

of Dallas County, Texas

(TC# F04-58401-U)

## O P I N I O N

Appellant was charged with capital murder. The jury returned a guilty verdict for the lesser-included offense of murder. The jury assessed punishment at seventy years' imprisonment. We affirm.

## I.  SUMMARY OF THE EVIDENCE

On November 17, 2004, Appellant and his uncle, Elizardo Guzman, the decedent, got into an altercation regarding the division of the proceeds from property that they had stolen from Appellant's grandmother (who is also Guzman's mother). Afterward, Appellant called Guzman's wife and related that her husband had hit him in the eye and that he was looking for him. Appellant was angry, and he stated that he was not going to let Guzman get away with it. Guzman's wife testified that Appellant and his uncle had a close relationship. She also stated that the deceased weighed over 200 pounds and was six feet tall, which made him much larger than Appellant.

On November 17, 2004, Diane Gonzalez was living in Apt. 104 of the Hamilton Apartments at 1211 Garden View in Dallas. Her family lived in Apt. 102. At sometime after 9 p.m., she and a

friend, Justo Chavez, were seated on her doorstep when Guzman, a family friend whom she had known for six years, walked up to them and stated that he and Appellant had gotten into a fight that evening. Guzman told them that he and Appellant were in a car and that Appellant was trying "to be bad in front of his girlfriend" and Appellant "put him out of the car." Guzman went to the other apartment to say hello to Gonzalez's mother, Berta Villareal; meanwhile, Gonzalez went into her apartment to use the restroom.

When Gonzalez came out of her apartment, a blue car pulled up. The driver was an African-American female, and Appellant was seated on the front passenger seat. Appellant had bruises and scrapes on his face. Appellant called to Gonzalez and asked for Guzman's whereabouts. She stated that Guzman was in her mother's apartment, and Appellant told her to go and call him. As Gonzalez walked toward the apartment, Appellant got out of the car and opened its back door. Gonzalez heard a gunshot, and she heard a shell casing striking the ground. She saw Appellant cock the gun, and he walked towards the apartment, yelling for Guzman to "bring his bitch ass outside." Appellant was carrying the rifle behind his back.

Guzman came outside and stood near the doorway. The two men began to argue, and Appellant told Guzman to "give [me] the money." Guzman responded that Appellant was stupid and that there was no money. Gonzalez testified that Appellant stated that he was not "playing." The argument went back and forth, until Appellant stated, "If you think I'm fucking playing" and he displayed the rifle. Gonzalez said that Guzman responded that he was not afraid and that "if he was going to shoot, to shoot." Guzman then put his hands up in the air, and he turned to walk away. Appellant stated, "You don't think I'll shoot you, you don't think I'll shoot you." Appellant then fired the rifle, and Guzman was hit in the leg. Guzman went back into the apartment.

2

Gonzalez ran back to her apartment and called 911. While she was calling, she heard multiple shots. Her mother ran into the apartment and screamed for Gonzalez to call the police as Appellant was shooting Guzman. She called a second time and then walked out onto the street. Gonzalez saw Appellant walking towards the street. He stated, "You think I'm fucking playing. I run this shit." Gonzalez went into her mother's apartment, which was filled with gun smoke. Guzman was on the floor, and her brother Romero was holding him. Gonzalez cut off some of Guzman's clothes and tried to stem the bleeding.

Appellant re-entered the apartment, and Gonzalez and her brother ran into the bedroom. She saw Appellant lean over Guzman and heard him ask Guzman for the money. Gonzalez quoted Appellant as saying that "it didn't have to be like this, that he just wanted the money." Appellant searched through Guzman's pockets and then stated that he "should have emptied the rest of the clip on him."

When the police arrived, Appellant ran into the bedroom and told Romero to help him hide the gun. Romero lifted the mattress, and Appellant put the gun under the mattress. Gonzalez, Romero, and Appellant were detained by the police and placed on a curb while the apartment was searched. Gonzalez did not immediately identify Appellant to the police, because she was afraid, and Appellant had told her to tell the police that "some black guy came in and shot him and took off running to the CVS."

Justo Chavez testified that he also lived at the Hamilton Apartments. On the night of the shooting, at about 9 p.m., he was visiting with Gonzalez in front of her apartment, when Guzman spoke to them. Guzman stated that he and Appellant has just been at a 7-Eleven store, where Appellant had tried to show off in front of his girlfriend, and Guzman had "laid him out." Chavez

and Guzman then walked to Villareal's apartment. Once inside the apartment, Guzman again recounted the facts of the fight with Appellant. Guzman heard Gonzalez call his name, and he went outside. Chavez saw Appellant and Guzman standing by the front door of the apartment.

Appellant cocked his rifle and stated, "You think I'm fucking playing." Guzman raised both his hands. He stated, "Do what you going to do." Guzman turned around and Appellant shot him in the back of the leg. Guzman ran back into the apartment. When Villareal and Guzman tried to close the door, Appellant shot through the door and hit Guzman a second time. Both Chavez and Guzman tried to run to the bedroom, but Appellant entered the apartment and shot Guzman again. Guzman fell to the floor and tried to reach out to Chavez, but more shots were fired, and Chavez hid in a closet. Chavez heard more shots fired, and he heard Guzman state, "Hey, man. You kill me." Chavez heard Appellant empty the rest of the ammunition clip. Chavez came out of the closet and saw Gonzalez and Romero trying to attend to Guzman's wounds. As Chavez walked out of the apartment, he saw Appellant returning.

Romero Villareal related that he lived in Apt. 102 with his parents. On the night of the shooting, he was at an apartment directly above his. He heard an argument, and he saw Appellant pointing a rifle at Guzman. He stated, "I want my money. You think I'm playing." He saw Guzman turn around and throw up his hands. Villareal heard him say, "If you are going to use it, use it." Appellant shot Guzman in the leg. Guzman grabbed his leg and ran back into the apartment. Appellant shot the door open and went into the apartment. Villareal heard Guzman state, "Stop. You're killing me. You already got me. What are you trying to prove?" He heard more gunshots, and when the shooting finally stopped, he saw Appellant walking away from the apartment. He had his rifle over his shoulder and he stated, "I run things around here. Y'all think I'm playing?"

4

Villareal went downstairs and went into his apartment. He saw Guzman on the floor. Chavez came out of the bedroom and walked away. Villareal and his sister, Diane Gonzalez, attempted to give Guzman first aid. Appellant came back into the apartment and everyone scattered. The witness and Gonzalez ran into the bedroom. Appellant asked Guzman, "Do you got my money yet?" Appellant went through Guzman's pockets. When the police arrived, Appellant asked Villareal to help hide the rifle, and it was placed underneath a mattress. The police restrained those in the apartment. Appellant stated to the police that two black guys had shot his uncle and had gone off to CVS.

Berta Villareal testified that on the night of the shooting, Guzman came to her apartment. While they were talking, he got up and went outside. She then saw him put up his hands, and he turned around to come back inside. She heard a gunshot and Guzman grabbed his leg and came into the apartment. He said, "Bertie, he shot me." Appellant tried to enter the apartment, and she tried to close the door, but Appellant fired another shot. Appellant came into the apartment and continued firing. She got behind a sofa. When the firing stopped, she ran to her daughter's apartment and told her to call the police. The witness then saw Appellant walking away saying, "I run shit here. This is how I do it." Villareal went back into her apartment and saw her daughter and son trying to administer to Guzman. Appellant then re-entered the apartment, and Villareal ran out. She told a police officer that Appellant had a rifle in the apartment. She heard Appellant state to an officer that some black guys were shooting and Guzman got caught in the cross-fire.

Dr. Sheila Spotswood, a medical examiner for Dallas County, performed an autopsy on Guzman. She testified that Guzman had been shot six times in the chest, three times in the right arm, and three times in the left leg. Four of the six shots to his chest were fired at close range,

5

approximately one foot away. Dr. Spotswood testified that the victim weighed 210 pounds, and the toxicology report revealed the presence of THC and marijuana. The victim sustained serious injuries to his right lung and liver from the gunshots. The cause of death was multiple gunshot wounds, and the manner of death was homicide.

## II. DISCUSSION

In Issue No. One, Appellant asserts that the court erred by refusing to charge the jury on the issue of self-defense. During the charge conference, Appellant requested that the jury be instructed on the issue of self-defense, and a requested jury charge was submitted. The court denied the requested charge.

A person is justified in using force against another when, and to the degree that, he reasonably believes the force is immediately necessary to protect himself against the other's use or attempted use of unlawful force. TEX. PEN. CODE ANN. § 9.31(a). A person is justified in using deadly force against another: (1) if he would be justified in using force against the other under section 9.31, (2) if a reasonable person in the actor's situation would not have retreated,[1] and (3) when, and to the degree that, he reasonably believes[2] the deadly force is immediately necessary to

---

[1] In 2007, the legislature amended sections 9.31 and 9.32 to remove the necessity for the fact finder to consider the failure of the accused to retreat, with regard to the use of force or deadly force in self-defense. The offense for which the jury convicted Appellant occurred in 2004. Our analysis of Appellant's appeal is therefore governed by the previous versions of these statutes. *See* Act of June 19, 1993, 73rd Leg., R.S., ch. 900, § 1.01, sec. 9.31, 1993 Tex. Gen. Laws 3586, 3598, and Act of May 27, 1995, 74th Leg., R.S., ch. 235, § 1, sec. 9.32, 1995 Tex. Gen. Laws 2141, 2141, both amended by Act of March 27, 2007, 80th Leg., R.S., ch. 1, § 5, 2007 Tex. Gen. Laws 1, 2 (codified as an amendment to TEX. PEN. CODE ANN. §§ 9.31, 9.32) (stating that an offense committed before the act's effective date is governed by the sections in effect when the offense was committed).

[2] "Reasonable belief" is defined as "a belief that would be held by an ordinary and prudent man in the same circumstances as the actor." TEX. PEN. CODE ANN. § 1.07(a)(42).

protect himself against the other's use or attempted use of unlawful deadly force.[3] TEX. PEN. CODE ANN. § 9.32(a).

A trial court must give a jury instruction on a defensive theory raised by the evidence, regardless of whether such evidence is strong, feeble, impeached, or contradicted, and even if the trial court is of the opinion that the testimony is not entitled to belief. *Brown v. State*, 955 S.W.2d 276, 279 (Tex. Crim. App. 1997). In order to be entitled to an instruction on the use of deadly force in self-defense, the defendant must produce some evidence on each of the three elements of section 9.32. *Henderson v. State*, 906 S.W.2d 589, 594-95 (Tex. App.--El Paso 1995, pet. ref'd).

In this case, Appellant did not testify. It is not, however, necessary that the defendant do so in order to raise the issue of self-defense, as the defense may be raised by other testimony that demonstrates that the accused acted in self-defense. *Smith v. State*, 676 S.W.2d 584, 587 (Tex. Crim. App. 1984). If the issue is raised by any party, refusal to submit the requested instruction is error. *Id.* But, if the evidence fails to raise a defensive issue, the trial court commits no error in refusing a request. *Id.*

Appellant contends that there is some evidence that he acted in self-defense, given the facts of the earlier confrontation between the two men, Guzman's lack of fear during the fatal confrontation (indicating that Appellant may have felt that Guzman was armed), and their close proximity during the argument in front of the apartment. However, the evidence from all sources indicates that Appellant was armed during the entire episode and that Guzman raised his hands in

---

[3] "Deadly force" means "force that is intended or known by the actor to cause, or in the manner of its use or intended use is capable of causing, death or serious bodily injury." TEX. PEN. CODE ANN. § 9.01(3). "Serious bodily injury" is defined as any injury that "creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." TEX. PEN. CODE ANN. § 1.07(a)(46).

the air and turned away from the confrontation.[4]  Furthermore, Appellant shot through the door when Guzman and others inside were trying to close the door.  The existence of fear of imminent bodily harm or death, to warrant a self-defense instruction, cannot be based upon mere speculation regarding the intentions of the complainant, absent any other evidence showing grounds for that fear. *Broussard v. State*, 809 S.W.2d 556, 559 (Tex. App.--Dallas 1991, pet. ref'd).

Appellant speculates that Appellant may have believed it was justifiable to shoot Guzman in the leg because he could not see what Guzman was doing when he turned away.  Accordingly, Appellant submits that he could not have safely retreated.  Again, Guzman was leaving the fray with his empty hands in the air, and he and others tried to close the door after the initial shot.  We find that the court did not err in denying Appellant's requested instruction.  Issue No. One is overruled.

In Issue No. Two, Appellant argues that the State committed *Batson*[5] error during jury selection.  After the State exercised its peremptory challenges, Appellant objected that the State had struck certain Hispanic and African-American venirepersons.  Specifically, Appellant objected to the State's having struck juror number sixty, Consepcion Steadman.[6]  During the *Batson* hearing, the prosecutor stated that he struck Steadman because she had revealed that one of her family members had shot another family member.  Notwithstanding Steadman's indication that she did not think that the incident would have an effect upon her, the prosecutor stated that, "Ms. Steadman indicated that she had had a nephew – either the cousin shot the nephew or the nephew shot the

---

[4]  Appellant points out that, on one occasion, Justo Chavez stated that Guzman "put his hand in the air." However, this statement was made immediately after the witness stated that Appellant raised both hands into the air. Further, even if this statement was not a misstatement, it does not amount to more than mere speculation regarding the intentions of the deceased.

[5]  *See Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712 (1986).

[6]  The parties agree that Steadman is Hispanic.

cousin. And when I asked the question about a prior experience, charged with, arrested, convicted and with the facts of this case being that we have a relative shooting another relative, I think that's way too close to even assume that Ms. Steadman could not set those – especially since she brought it up." The court then ruled that the prosecutor's reasons were "race neutral."

When reviewing a *Batson* challenge, an appellate court examines the record in the light most favorable to the trial court's ruling and reverses only when the ruling is clearly erroneous. *Herron v. State*, 86 S.W.3d 621, 630 (Tex. Crim. App. 2002); *Pondexter v. State*, 942 S.W.2d 577, 581 (Tex. Crim. App. 1996), *cert. denied*, 522 U.S. 825 (1997); *Bausley v. State*, 997 S.W.2d 313, 315 (Tex. App.--Dallas 1999, pet. ref'd). A ruling is clearly erroneous when, after searching the record, an appellate court is left with the definite and firm conviction that the trial court has made a mistake. *Bausley*, 997 S.W.2d at 315. If the record, including the voir dire, the prosecutor's explanation of his peremptory challenges, appellant's rebuttal, and any impeaching evidence, supports the trial court's ruling, then the ruling is not clearly erroneous. *Id.*

To challenge the State's use of peremptory strikes under *Batson*, a defendant must first make a *prima facie* showing that the State exercised peremptory strikes on an impermissible basis. *Herron*, 86 S.W.3d at 630; *Bausley*, 997 S.W.2d at 316. Once the defendant makes a *prima facie* showing of purposeful discrimination, the State must provide a race- or gender-neutral explanation for striking the prospective juror in question.[7] *Miller-El v. Dretke*, 545 U.S. 231, 239, 125 S. Ct. 2317, 2324-25 (2005); *Herron*, 86 S.W.3d at 630; *Pondexter*, 942 S.W.2d at 581; *Bausley*, 997

---

[7] The first two steps of a *Batson* analysis, including the burden on the State to provide a neutral explanation for its strikes, involve solely a burden of <u>production</u>; the burden of <u>persuasion</u>, described in more detail below, remains at all times on the defendant. *Johnson v. California*, 545 U.S. 162, 171-72, 125 S. Ct. 2410, 2417-18 (2005); *Peetz v. State*, 180 S.W.3d 755, 759 (Tex. App.--Houston [14th Dist.] 2005, no pet.).

S.W.2d at 316. This step requires an explanation devoid of inherent discriminatory intent. *Bausley*, 997 S.W.2d at 316 (citing *Purkett v. Elem*, 514 U.S. 765, 768, 115 S. Ct. 1769, 1771 (1995) (per curiam)). An explanation is neutral in this context if the State bases it on something other than the prospective juror's race or gender. *See Hernandez v. New York*, 500 U.S. 352, 360, 111 S. Ct. 1859, 1866 (1991). Unless discriminatory intent is inherent, the courts will consider the explanation race- or gender-neutral. *See id.* A juror's involvement with the criminal justice system, either personally or in connection with a family member, is a valid, neutral basis for exercising a peremptory challenge. *See Thornton v. State*, 925 S.W.2d 7, 11 (Tex. App.--Tyler 1994, pet. ref'd) (prospective juror related to people with criminal records); *Dorsey v. State*, 940 S.W.2d 169, 175 (Tex. App. --Dallas 1996, pet. ref'd) (prospective juror's uncle convicted of crime).

If the State provides a race- or gender-neutral explanation for its strikes, the defendant may rebut the State's explanation or show that the explanation was merely a sham or pretext.[8] *See Herron*, 86 S.W.3d at 630; *Pondexter*, 942 S.W.2d at 581; *Bausley*, 997 S.W.2d at 316. To meet this burden, the defendant may call witnesses and introduce evidence, just as in any other evidentiary hearing. *Bausley*, 997 S.W.2d at 316. The defendant has the ultimate burden of persuasion to establish the truth of his allegations of purposeful discrimination. *Id.* At this third step, the persuasiveness of the justification becomes relevant. *See Purkett*, 514 U.S. at 768, 115 S. Ct. at 1771. Disparate treatment between jurors with similar attributes cannot automatically be imputed in every situation in which one of counsel's reasons for striking a prospective juror would technically apply to another juror who was not stricken. *Cantu v. State*, 842 S.W.2d 667, 689 (Tex. Crim. App.

---

[8] The foregoing three-step production-burden-shifting analysis is similar to the *McDonnell Douglas* test widely used for establishing employment discrimination under Title VII of the Civil Rights Act of 1964. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 5 Fair Empl. Prac. Cas. (BNA) 965 (1973).

1992), *cert. denied*, 509 U.S. 926 (1993).  Even when disparate treatment of veniremembers with similar characteristics is shown, the record must reflect more than the mere fact that the objectionable characteristic of a stricken juror was also possessed by accepted jurors of a different racial background.  *See id.*  Different jurors may possess the same objectionable characteristics, but in differing degrees.  *Id.*  Such qualitative distinctions may cause a prosecutor to challenge one juror and not another.  *Id.*

Appellant maintains that the record reveals the existence of disparate treatment of the jurors because juror number five, Chris Hauge,[9] stated that he had a family member who fit within the category  of having been charged with, arrested for, or convicted of a criminal offense, and the prosecution did not strike him.

Initially, we note that Appellant did not respond to the prosecutor's explanation regarding veniremember Steadman.  Appellant failed to offer any rebuttal to the prosecutor's proffered race-neutral explanation for striking Steadman from the jury.  Such failure is usually fatal to a *Batson* claim.  *Johnson v. State*, 68 S.W.3d 644, 649 (Tex. Crim. App. 2002).  Moreover, we perceive a difference between striking a potential juror, where the facts of a violent incident in her family closely resemble the facts of the case being tried, while not striking a different potential juror who had some family member who had been charged with, arrested for, or convicted of a criminal offense.  We find that Appellant has failed to meet his burden in establishing his *Batson* claim.  Issue No. Two is overruled.

In Issue No. Three, Appellant asserts that the court erred in admitting autopsy photographs of the victim.  Appellant alleges that State's Exhibits 106, 108, 109, and 123-125, depicting the

---

[9]  Hauge is white, non-Hispanic.

autopsy of the victim, were inadmissible, because their probative value was substantially outweighed by the danger of unfair prejudice. *Cf.* TEX. R. EVID. 403.

Dr. Spotswood, the medical examiner, identified the foregoing exhibits as photographs that fairly and accurately depicted the victim's body at the time of the autopsy. Appellant objected to the admission of the exhibits. Dr. Spotswood testified concerning the twelve gunshot wounds on Guzman's body, and the location and damage caused by each bullet. She testified that State's Exhibit 106 showed the body in the condition in which it was received by the medical examiner's office. Exhibits 108 and 109 depicted views of the body after removing the hospital treatment. Exhibit 123 showed a closeup photograph of the entrance, exit, and re-entry wounds from shot number seven and the exit wound of shot number eight to the victim's right elbow. Exhibit 124 depicted a closeup photograph of the entrance and exit wounds from shot number seven and the exit wound from shot number eight to the victim's right elbow, while Exhibit 125 showed a closeup photograph of the exit wound from shot number eight to the victim's right elbow.

In *Long v. State*, 823 S.W.2d 259 (Tex. Crim. App. 1991), *cert. denied*, 505 U.S. 1224 (1992), the Court of Criminal Appeals utilized the holdings in *Montgomery v. State*, 810 S.W.2d 372 (Tex. Crim. App. 1991), which dealt specifically with the admissibility of extraneous offenses under Rule 404(b) of the Texas Rules of Criminal Evidence. The court held that the determinations in *Montgomery* regarding Rules 401, 402, and 403 apply when addressing the admissibility of evidence in general. *Long,* 823 S.W.2d at 271.

In *Long*, the court set forth seven factors to be utilized in applying the Rule 403 balancing test: (1) the number of photos being offered; (2) their gruesomeness; (3) their detail; (4) their size; (5) whether the photos are black and white or color; (6) whether they are taken close-up; and (7)

whether the body is naked or clothed. *Long*, 823 S.W.2d at 272. In determining the admissibility of photographs, a court should consider the circumstances unique to each case and other available means of proof. *Id.* One such circumstance is the situation where a verbal description of injuries is admissible and the photos depict that testimony. Unless the prejudicial effect substantially outweighs their probativeness, the photos are admissible. *Long*, 823 S.W.2d at 271.

Further, while photographs may depict the brutality of the offense, when the "power of the visible evidence emanates from nothing more than what the defendant has himself done we cannot hold that the trial court has abused its discretion merely because it admitted the evidence." *Paredes v. State*, 129 S.W.3d 530, 540 (Tex. Crim. App. 2004).

Here, the photographs depict the brutality of the offense. They are not overly gruesome, and they do not depict bodily mutilation. The exhibits merely illustrated the medical examiner's description of the victim's injuries, and the trial court did not abuse its discretion in admitting them. Issue No. Three is overruled.

## III. CONCLUSION

We affirm the judgment of the trial court.

KENNETH R. CARR, Justice

May 22, 2008

Before Chew, C.J., McClure, and Carr, JJ.

(Do Not Publish)

13