

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NOS. 02-10-00271-CR
### 02-10-00272-CR

TIMOTHY ERNEST MAY                                                    APPELLANT

V.

THE STATE OF TEXAS                                                         STATE

------------

FROM THE 355TH DISTRICT COURT OF HOOD COUNTY

------------

## MEMORANDUM OPINION[1]

------------

### I. Introduction

In three issues in cause number 02-10-00271-CR, and in two issues in cause number 02-10-00272-CR, Appellant Timothy Ernest May appeals his convictions for felony driving while intoxicated (DWI) and felony evading arrest using a vehicle. We affirm.

---

[1]*See* Tex. R. App. P. 47.4.

## II.  Factual and Procedural Background

On June 15, 2009, May drove off after rear-ending another vehicle and then, after being stopped for an unrelated incident, drove away instead of exiting the vehicle as requested by the officer who stopped him.  The officer chased him, and his pursuit ended after May rolled his vehicle, a white Kia Sorento bearing Texas license plate number NGY 203.[2]

May was charged in cause number CR11479 (appellate cause number 02-10-00271-CR) with committing felony DWI after having been previously convicted of DWI in 1992 and again in 1996, and he stipulated to his two prior DWI convictions.  May was charged in cause number CR11362 (appellate cause number 02-10-00272-CR) with committing evading arrest using a vehicle.  Both indictments contained an enhancement paragraph and a habitual count, and the State filed deadly weapon notices in both causes regarding the use of a "white Kia Sorento bearing Texas license plate number NGY 203."  May pleaded not guilty to the charges, but the jury found May guilty of both charges.  The jury also found in both causes that the white Kia Sorento was a deadly weapon used during the commission of the offenses.  May pleaded true to the enhancement paragraph and habitual count in each case, and the jury found these allegations true and assessed May's punishment at seventy-five years' confinement in each

---

[2]Because May challenges the sufficiency of the evidence, we will address the facts in greater detail below.

cause. The trial court entered judgment on the verdicts, and these appeals followed.

### III. Sufficiency of the Evidence

In his third issue in his brief in cause number 02-10-00271-CR, May complains that the evidence is not legally and factually sufficient to support his DWI conviction because the evidence is insufficient to prove beyond a reasonable doubt that he was intoxicated at the time he was driving. In his second issue in his brief in cause number 02-10-00271-CR and his second issue in his brief in cause number 02-10-00272-CR, he complains that the evidence is legally and factually insufficient to show that he "used his automobile as a deadly weapon" in, respectively, the DWI case and in the evading arrest case.[3]

The court of criminal appeals has overruled *Clewis v. State*, 922 S.W.2d 126 (Tex. Crim. App. 1996), upon which the factual sufficiency standard of review is based, and decided "that the *Jackson v. Virginia* legal-sufficiency standard is the only standard that a reviewing court should apply in determining whether the evidence is sufficient to support each element of a criminal offense that the State is required to prove beyond a reasonable doubt." *Brooks v. State*, 323 S.W.3d

---

[3]In his brief in cause number 02-10-00272-CR—the appeal of his evading arrest conviction—May challenges the sufficiency of the evidence to support the deadly weapon finding but not any elements of the offense. And based on the evidence set out below, the jury could have found the elements required to support this conviction beyond a reasonable doubt. *See* Tex. Penal Code Ann. § 38.04 (West 2008) (stating that a person commits an offense if he intentionally flees from a person he knows is a peace officer attempting to lawfully arrest or detain him).

893, 895 (Tex. Crim. App. 2010). Therefore, we will review May's sufficiency issues under *Jackson*.

## A. Standard of Review

In our due-process review of the sufficiency of the evidence to support a conviction, we view all of the evidence in the light most favorable to the prosecution to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).

## B. Evidence

All of the testimony during the guilt-innocence phase of trial pertained to the events of June 15, 2009. Carlye Underwood testified that she, her two children, and a friend were stopped at a red light in front of the Majestic Liquor Store in Granbury when a white Kia Sorento hit her car. She pulled onto a nearby road, and the Kia drove past her. The Kia then returned by driving over the grass and jumping the curb before stopping perpendicular to her vehicle. The Kia's driver, who Underwood identified as May, rolled down his window, and Underwood asked him for his insurance card. May stepped out of his vehicle and never said a word to Underwood. Underwood said that when May got out of his vehicle, he stumbled and put his hand on her car to hold himself up; based on

4

the way he walked and his driving, she concluded that he was drunk. Underwood's friend called 911.[4]

Underwood testified that she moved her vehicle into the Majestic parking lot and had expected May to do the same. Instead, May returned to his vehicle and then drove through the Majestic parking lot and back out again, jumping another curb. Underwood spoke with Granbury Police Officer Kevin Clapp when he arrived and gave him the Kia's license plate number, NGY-203.

Nathan Jernigan saw the incident, which occurred around 5:00 p.m., stating,

> I just happened to look up and saw—saw the accident happen, saw him slam into the back of the vehicle in front of him. At first, [I] didn't really think anything of it, besides, "Hey, there's another accident." And the next thing I know, the one—the vehicle who did the—who crashed into the rear of the other vehicle just kept going straight and took off, veered to the side of him towards the median in the road and just kept on driving.

Then Jernigan saw the same white car jump the median and stop on the road, right next to the liquor store. Jernigan continued, stating,

> Well, when he came back, I just thought, "Hey, he—he wised up, he came back." And—and then I was fixing to go into the store, and he started rolling down his window, and he had rolled it down, and you see him, he was just in there, you could tell there was something wrong, because he—he—he wasn't—to me, it just wasn't—my opinion, he just wasn't normal. He—he was just swaying back and forth in that vehicle.

---

[4]The trial court admitted the 911 call and allowed the recording to be published to the jury.

Based on what he had seen, Jernigan believed the driver of the white vehicle was intoxicated. During cross-examination, Jernigan admitted that he did not know May, so he did not know what May looked like normally.

Department of Public Safety (DPS) State Trooper Nick Duecker testified that he was heading west on Old Granbury Road, a narrow two-lane road, when he saw a white Kia Sorento heading east. The Kia edged into his side of the road and almost hit him head-on, but the Kia's driver did not appear to notice the trooper's vehicle. Trooper Duecker testified, "[W]hen he went by, he didn't even acknowledge . . . that I was there." Trooper Duecker turned his vehicle around and activated his overhead lights, which turned on the vehicle's dashboard camera.

Trooper Duecker testified that it took close to half a mile for the Kia to stop after he activated his vehicle's lights and then described his initial encounter with May:

> As I walked up, the—the passenger side window was up, and—and I observed the driver fumbling around in his wallet, which I was assuming he was looking for his driver's license. I—I knocked on the window, and he—he acted startled at first, acknowledged me, and ended up rolling down the window. . . . I explained to the—to the driver why he had been stopped, and, again, he didn't even acknowledge like he had even done anything wrong, like he didn't know what I was talking about. I asked him for his driver's license and proof of insurance on the car, and it—it took him—it took him a long time in order to get his driver's license. I could see it sitting there. He—he went past it several times in his—in his wallet, like he didn't exactly know what he was looking for.

6

Trooper Duecker stated that he asked May where he was going and that May said he was coming from Fort Worth and heading to his home at 3939 Country Meadows. Trooper Duecker noticed that May had severely slurred speech, to the point that the trooper almost could not understand him, and that there was a strong chemical smell coming from inside May's vehicle. May's vehicle contained several cleaning supplies, and the trooper noted that May "was acting almost like he was . . . high from those chemicals." Trooper Duecker stated that he knew at that point that May was under the influence of something, because his behavior was consistent with intoxication, but he was not sure about the type of intoxicant.

When Trooper Duecker walked around to the front of the Kia, he noticed that the front end was smashed in. May told the trooper that he had hit a deer in Granbury thirty minutes before. While standing next to May's driver side window, the trooper asked May if he had been drinking. May said, "Yes," and, when asked how much, May said that he had had one drink. The trooper said that at this point, he could smell alcohol on May's breath.

Trooper Duecker returned to his vehicle, ran May's driver's license and license plates, and called for back-up. When Officer Kevin Clapp arrived, he told Trooper Duecker that he had been looking for the Kia because it had been involved in a crash in Granbury. After conferring with Officer Clapp, Trooper Duecker returned to May's vehicle. When Trooper Duecker tried to get May out of the vehicle for sobriety tests, May gave him a blank stare and then slammed

7

the Kia into drive and took off. Trooper Duecker ran back to his vehicle, turned on his siren, and pursued May.

The trial court admitted Trooper Duecker's dashboard camera DVD, which was published to the jury. The DVD clearly shows May careening back and forth across the road as he flees from the trooper, spinning out into a ditch before continuing to flee, dipping into ditches as he drives, slamming into a large trash can on the roadside, and, while driving on the wrong side of the road, just barely missing hitting a vehicle head-on. The DVD then shows May driving through a stop sign and continuing to swerve back and forth across the road and to drive on the wrong side of the road before finally spinning out and rolling his vehicle all the way over, crumpling the roof and shattering the windshield. As corroborated by the DVD, Trooper Duecker testified that during the pursuit, May drove on the wrong side of the road more than once and that May traveled in a head-on direction towards an oncoming vehicle, as he had previously done before the traffic stop.

Trooper Duecker testified that a vehicle is dangerous when not operated correctly because it weighs around 4,000 pounds and is capable of causing death or serious bodily injury, stating, "[I]f it hits you, I mean, it's a deadly weapon . . . [N]o other way to look at it." Trooper Duecker agreed that the manner in which May used his vehicle was capable of causing death or serious bodily injury. He also testified that May was not in control of his vehicle when he rolled it and that May left the scene of the accident in an ambulance. Trooper

8

Duecker testified that, based on his observations, he concluded that May was intoxicated.

On cross-examination, Trooper Duecker acknowledged that the reason May said he was coming from Fort Worth could have been that May did not want to tip him off about the earlier crash; that he did not know what May's normal speech was like or whether May's normal pattern of speaking was to slur his words; and that May did not pause and think about his answer when he told the trooper that the damage to the front of May's vehicle was caused by hitting a deer. The trooper agreed that May's responses could be indicative of May's normal mental capabilities. Trooper Duecker also replied, "I guess it could be," when asked if it were possible that some of the alcohol he smelled emitting from the vehicle was actually from the cleaning supplies in May's car, and he admitted that he did not examine the chemicals or determine their alcohol concentrations. The trooper also agreed that May's fleeing when he tried to detain May could be either because of a "bonehead decision" by May or because May was intoxicated.

Officer Clapp testified that he had finished investigating the hit-and-run when he heard Trooper Duecker call for assistance.[5] Officer Clapp was less than a mile away from Trooper Duecker's location, and he noticed when he arrived

_____

[5]Officer Clapp testified that it was just after 5:00 p.m. when he received the report of a hit-and-run near the Majestic liquor store. When he arrived at the scene, Underwood gave him the Kia's license plate number, NGY 203.

that the license plate of the vehicle the trooper had stopped was the same as the one Underwood had given him. Officer Clapp testified that he pursued May when May fled from Trooper Duecker and that he had to drive around eighty-five miles per hour to keep up. May "was all over the road," swerving into ditches and into oncoming traffic. Officer Clapp testified that an automobile is something that can be a deadly weapon, capable of causing death and serious bodily injury, and that May used the Kia in such a manner that day.

After May wrecked his vehicle, Officer Clapp tried to help remove May from his vehicle by opening the door. When he did so, May fell to the ground and appeared to be snoring. Officer Clapp stated that May's driving during the pursuit was not that of a normal person and that, based on the driving and May's appearance after the pursuit ended, he concluded that May was intoxicated. However, he admitted that he did not smell alcohol on May or smell alcohol coming from the vehicle.

Jody Alvey, a Hood County paramedic, testified that she provided treatment to May after he rolled his vehicle. She and her partner transported May to a trauma center at Harris Methodist Hospital in Fort Worth around 6:16 p.m. The trial court admitted May's medical records from the hospital as State's Exhibit 7. Alvey read from her notes, which were included in State's Exhibit 7, as follows, "Patient admitted to EMS crew that he had been drinking today[,] about six beers and some vodka." In the patient history portion obtained from May

regarding his alcohol use, the report reflects that May said that he drank a case or more per week of twelve-ounce beers.

The toxicology report on the sample collected at 7:04 p.m., around forty-five minutes after May's rollover, recited "302" under "Tests, alcohol ethyl." Lindsay Hatfield, a DPS forensic scientist, testified that the "302" represented 302 milligrams of alcohol per deciliter of blood serum. Hatfield explained the conversion from milligrams per deciliter of serum to grams per 100 milliliters of whole blood and then converted May's 302 milligrams per deciliter to a .25 blood alcohol concentration. Hatfield explained that to reach a .25 blood alcohol concentration, a 150-pound male would have to drink roughly twelve drinks in an hour.

Dustra Burrow, a Granbury bail bonding agent, testified that she wrote the bond for May on the evading arrest and felony DWI charges. The trial court took judicial notice that May failed to appear for trial on May 24, 2010, and that judgments nisi were entered that day. Burrow searched for May for around twenty-one days after his failure to appear, checking at his residence and any other location she thought he might be and calling his cell phone. Burrow agreed that she heard May make statements that indicated to her that he knew he was supposed to turn himself in during the three weeks following his failure to appear.

George Turner, an investigator for the Hood County District Attorney's office, testified that he was asked to help locate May after May failed to appear for trial on May 24. He called May's friends, May's preacher, and May's family

11

members between May 24 and June 8. May called Turner on June 8, stating that he was turning himself in because he was tired of running from the police. Turner arranged to meet May at his Country Meadows residence. May indicated to Turner that he knew that the sheriff's office had been looking for him. Turner transported May to jail.

## C. Intoxication

In his third issue in cause number 02-10-00271-CR, May claims that the evidence is insufficient to convict him of DWI because no one found any beer bottles or cans or liquor bottles in his car, because no one gave him any sobriety tests, and because Officer Clapp testified that he did not smell alcohol on May.[6] May contends that the only evidence that he had been drinking was in the form of his admission, made during Trooper Duecker's stop, that he had had one beer.

---

[6]May also complains that the evidence is insufficient to convict him of DWI because the individual who drew his blood did not testify and the chain of custody was not established between that individual and the DPS chemist who testified about the blood's alcohol content. However, State's Exhibit 7—the hospital records containing May's blood test results—and Hatfield's testimony regarding the conversion of the results to his blood alcohol concentration of .25 were admitted without objection, even though the EMT's testimony during cross-examination established that she did not perform the blood draw or the blood test. Further, May raised no objections with regard to this chain of custody or his right of confrontation during trial. Therefore, May has failed to preserve this portion of his complaint for our review. We also note that even if May had objected and his objection had been overruled, we would still consider this evidence because we consider all of the evidence admitted at trial, even improperly admitted evidence, when performing a sufficiency review. *See Clayton*, 235 S.W.3d at 778; *Moff v. State*, 131 S.W.3d 485, 489–90 (Tex. Crim. App. 2004).

A person commits an offense if he is intoxicated while operating a motor vehicle in a public place. Tex. Penal Code Ann. § 49.04(a) (West 2011). An offense under section 49.04 is a third degree felony if it is shown on the trial of the offense that the person has previously been convicted two times of any offense relating to the operation of a motor vehicle while intoxicated. *Id*. § 49.09(b)(2) (West 2011). May stipulated to his two prior DWI convictions, and the evidence recounted above affirmatively supports that he operated a motor vehicle in a public place.

"Intoxicated" is defined in the penal code as "not having the normal use of mental or physical faculties by reason of the introduction of alcohol . . . or any other substance into the body" or as "having an alcohol concentration of 0.08 or more." *Id*. § 49.01 (West 2011). Notwithstanding May's .25 blood alcohol content level around two hours after he hit Underwood's vehicle,[7] the testimony at trial reflected that Trooper Duecker smelled alcohol on May's breath when he spoke with him during the traffic stop, and he noted that May had severely slurred speech. Further, the jury saw the trooper's dashboard camera videotape showing May's driving—weaving to and fro across a narrow two-lane road, driving on the wrong side of the road, and dipping in and out of ditches before rolling his vehicle. Jernigan and Underwood also testified about May's driving and unusual behavior, and Alvey testified that May admitted to the EMS crew

---

[7]The trial court did not charge the jury on the blood alcohol content definition of intoxication.

that he had been drinking.[8]  Viewing all of the evidence in the light most favorable to the prosecution, we conclude that the jury could have found that May was intoxicated by not having the normal use of his mental or physical faculties by reason of the introduction of alcohol into his body.  *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Clayton*, 235 S.W.3d at 778.  We overrule May's third issue in cause number 02-10-00271-CR.

## D.  Deadly Weapon

In his second issue in both cause number 02-10-00271-CR and in cause number 02-10-00272-CR, May argues that the evidence is legally and factually insufficient to prove that he used his automobile as a deadly weapon in either offense.  In both of his appellate briefs, May focuses on what he calls the State's failure to introduce evidence that his vehicle endangered another motorist when he rolled his vehicle and that he safely passed a car that was going in the opposite direction and passed some stopped cars without putting them in actual danger.  He further argues that he directed no overt acts at anyone and that more than hypothetical danger must be shown.  That is, May does not address his driving prior to the inception of his evading arrest actions, and he argues that the "evidence was such that [he] only wanted to get away."

---

[8]Additionally, Burrow and Turner both testified that May failed to appear for his original trial date, and Turner testified that May told him he was turning himself in because he was tired of running from the police.  *See Clay v. State*, 240 S.W.3d 895, 905 n.11 (Tex. Crim. App. 2007) ("Evidence of flight evinces a consciousness of guilt.").

A deadly weapon finding is authorized upon sufficient evidence that a defendant "used or exhibited" a deadly weapon during the commission of or flight from a felony offense. *Drichas v. State*, 175 S.W.3d 795, 798 (Tex. Crim. App. 2005). A deadly weapon is "anything that in the manner of its use or intended use is capable of causing death or serious bodily injury." Tex. Penal Code Ann. § 1.07(a)(17)(B) (West 2011). A motor vehicle may become a deadly weapon if the manner of its use is capable of causing death or serious bodily injury, and specific intent to use a motor vehicle as a deadly weapon is not required. *Drichas*, 175 S.W.3d at 798.

To determine whether the evidence supports a deadly weapon finding in cases involving motor vehicles, we conduct a two-part analysis by (1) evaluating the manner in which the defendant used the motor vehicle during the felony and (2) considering whether, during the felony, the motor vehicle was capable of causing death or serious bodily injury. *Hilburn v. State*, 312 S.W.3d 169, 177 (Tex. App.—Fort Worth 2010, no pet.) (citing *Sierra v. State*, 280 S.W.3d 250, 255 (Tex. Crim. App. 2009)). We consider several factors in determining whether the defendant's driving was reckless or dangerous: intoxication, speeding, disregard of traffic signs and signals, erratic driving, and failure to control the vehicle. *Sierra*, 280 S.W.3d at 255–56.

The evidence regarding how May drove began with testimony that May "slammed" into the back of Underwood's car, which was stopped at a red light. May then proceeded to drive over the grass and jump a curb. After he briefly

15

exited his vehicle, he returned to his car and drove off, jumping another curb. Jernigan described May's demeanor as not normal and said that May swayed back and forth inside his vehicle. Underwood testified that when May emerged from his vehicle, he stumbled and had to put his hand on her car to hold himself up—based on the way he walked, his demeanor, and his driving, she concluded that he was drunk. And Trooper Duecker testified that May nearly hit his vehicle head-on, which led the trooper to conduct a traffic stop. *See Drichas*, 175 S.W.3d at 799 ("[A] deadly weapon finding is appropriate on a sufficient showing of actual danger, such as evidence that another motorist was on the highway at the same time and place as the defendant when the defendant drove in a dangerous manner.").

May then began evading Trooper Duecker, and Trooper Duecker's dashboard camera video revealed that May nearly caused another head-on collision. Officer Clapp testified that he had to drive around eighty-five miles per hour on the narrow, two-lane road to keep up with May while Trooper Duecker pursued him. The video revealed that May ran a traffic sign, wove back and forth across the entire road, dipped into ditches, and drove on the wrong side of the road before he lost control of his vehicle and rolled it. Both officers testified that the manner in which May used his vehicle was capable of causing death or serious bodily injury.

We have already concluded above that the evidence is legally sufficient to support the jury's intoxication finding. *See id*. Viewed in the light most favorable

16

to the prosecution, the jury could have found beyond a reasonable doubt that May used his vehicle as a deadly weapon during the commission of the felony DWI and during the commission of the evading arrest offense.[9]  *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Clayton*, 235 S.W.3d at 778; *see also Drichas*, 175 S.W.3d at 798 (stating that the appellant's manner of using his vehicle "made it capable of causing death or serious bodily injury, particularly where appellant drove on the wrong side of the highway").  We overrule May's second issue in cause number 02-10-00271-CR and his second issue in cause number 02-10-00272-CR.

### IV.  Motion for Mistrial

In his first issue in cause number 02-10-00271-CR and his first issue in cause number 02-10-00272-CR, May argues that the trial court erred by denying his motion for mistrial by allowing his trial to proceed after he was handcuffed and escorted by officers past the open door of the jury room where the jury waited.

May cites *Long v. State*, 823 S.W.2d 259, 282 (Tex. Crim. App. 1991), *cert. denied*, 505 U.S. 1224 (1992), to support his argument.  In *Long*, the court

---

[9]During trial, May's counsel's only objection to the deadly weapon special instruction included in each cause was that the evidence was not sufficient in either cause to support it.  He did not move to sever the two causes at trial.  Instead, he focused during his opening statement on whether May's "bonehead decisions" rose to the level of reasonable doubt and stated that the case's key issue was "Has the government proved intoxication?"  May does not raise any issue in either appeal regarding whether the offenses should be treated as two criminal episodes or a single criminal episode.

of criminal appeals concluded that the trial court abused its discretion when, even though the defendant was on trial for committing three brutal murders, there was nothing in the record to support the trial court's decision to keep him shackled during voir dire and trial. *Id*. at 263–64, 282–83. However, the court also concluded that the abuse of discretion was harmless because "[w]hile appellant was shackled throughout his trial, even while testifying, he fail[ed] to direct our attention to any place in the record showing that the jury *actually saw* the shackles." *Id.* at 283 (emphasis added).

May was searched outside the jury's presence after both parties made their opening statements. May's counsel then requested permission to voir dire the bailiff:

> I have some information I would like to put on the record before the jury returns. It's possible—Mr. May was just now detained, placed in handcuffs and walked past the jury room while the jury was able to observe him, and it might prejudice my jury, Judge, if that, in fact, occurred. I visited with the bailiff and wasn't much information shared with me to decide whether that has occurred or not, so if the Court would allow me to voir dire the bailiff in this case, with all due respect to him, I just need to answer—ask him a couple of questions. Would that be okay?

The trial court granted permission.

Harold Clemmons, the bailiff, testified that May was placed in handcuffs inside the courtroom and outside the jury's presence by the detention officers from the sheriff's department and that the detention officers escorted May out of the courtroom. Clemmons also testified that when the jury had adjourned, he pointed them to the jury room. All twelve jurors went inside, but he did not seal

18

them inside by shutting the jury room door. He explained, however, "[T]hey could not see [May] pass by. I looked, I checked to make sure they could not see him. I never let them be—see him handcuffed in—the defendant." Clemmons said that he stood across from the jury room and made sure that none of the jurors approached the door. The door was not shut before May returned to the courtroom, but May was not in handcuffs when he returned, escorted by the two detention officers.

Clara Brooks, one of the detention officers, testified that Clemmons's testimony was accurate and that she handcuffed May's hands behind his back and then escorted him out. Brooks testified that she did not close the jury door as she went out. Kyle Pettijohn, the other detention officer, agreed that Brooks's and Clemmons's testimonies were accurate. Pettijohn testified that he was also behind May when he and Brooks escorted May out of the courtroom and that he did not shut the door to the jury room. May's counsel then argued:

> Your Honor, at this time I—I have no—no more witnesses to call other than the fact that we would urge the Court—we would move for a mistrial at this time, because my jury for Mr. May has been prejudiced by the fact that they observed him in handcuffs, with his arms to his rear, escorted by officers past the jury room door, and Judge, that does not in any way indicate a fair trial for Mr. May. That prejudice—prejudices all people's opinion, or those 12 who saw him, and, Judge, I just don't think this trial could go on.

The trial court denied his motion.

19

In contrast to *Long*, the trial court here did not require May to appear in restraints during voir dire and trial.[10]  *Cf. Long*, 823 S.W.2d at 282–83.  Further, the record does not reveal any evidence that any juror actually saw May in handcuffs.  *See id.* at 283; *see also Canales v. State*, 98 S.W.3d 690, 697–98 (Tex. Crim. App.) ("Nothing in the record indicates that the jury ever saw or heard or was otherwise aware that appellant was wearing shackles."), *cert. denied*, 540 U.S. 1051 (2003); *Cooks v. State*, 844 S.W.2d 697, 723 (Tex. Crim. App. 1992) ("Here, as in *Long*, appellant does not direct us to any evidence in the record that the jury actually observed the shackles."), *cert. denied*, 509 U.S. 927 (1993). Rather, Clemmons testified that he made sure that the jury did *not* see May in handcuffs, and no one on the jury testified.  *Cf. Clark*, 717 S.W.2d at 918–19. Absent evidence that the jury actually became aware of May being temporarily in

---

[10]May's other citations to authority are also inapposite.  *See Marquez v. State*, 725 S.W.2d 217, 227–30 (Tex. Crim. App.) (involving a punishment trial in which the defendant was shackled before the jury), *cert. denied*, 484 U.S. 872 (1987), *overruled on other grounds by Moody v. State*, 827 S.W.2d 875, 892 (Tex. Crim. App. 1992); *Clark v. State*, 717 S.W.2d 910, 918–19 (Tex. Crim. App. 1986) (holding that even when several jurors testified that they saw appellant in handcuffs outside of the courtroom, there was no evidence that these jurors discussed this with the jurors who did not see him in handcuffs or that this influenced or affected the decisions on guilt or punishment of any of the jurors who saw him in handcuffs), *cert. denied*, 481 U.S. 1059 (1987); *Moore v. State*, 535 S.W.2d 357, 357–58 (Tex. Crim. App. 1976) (stating that on two occasions, in full view of the jury, the sheriff escorted appellant into the courtroom in handcuffs, and on three other occasions, jurors saw appellant brought into the courtroom in handcuffs), *overruled on other grounds by Sneed v. State*, 670 S.W.2d 262 (Tex. Crim. App. 1984); *Gray v. State*, 99 Tex. Crim. 305, 268 S.W. 941, 949 (1924) (op. on reh'g) (noting that appellant was kept in handcuffs during trial).

handcuffs, we conclude that May was not harmed.  *See Long*, 823 S.W.2d at 283.  Therefore, we overrule May's first issue in both cause numbers.

## V.  Conclusion

Having overruled all of May's issues, we affirm the trial court's judgments.


PER CURIAM

PANEL:  MCCOY, J.; LIVINGSTON, C.J.; and DAUPHINOT, J.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED:  July 28, 2011